331 So.2d 455 (1975)
STATE of Louisiana, Appellee,
v.
Sammy K. LEE, Appellant.
No. 56244.
Supreme Court of Louisiana.
November 3, 1975.
Dissenting Opinion November 24, 1975.
On Rehearing March 29, 1976.
Dissenting Opinion April 19, 1976.
Dissenting Opinion On Rehearing May 17, 1976.
*457 James A. Hobbs, Jones, Blackwell, Chambliss, Hobbs & Henry, West Monroe, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., J. Carl Parkerson, Dist. Atty., John R. Harrison, Asst. Dist. Atty., for plaintiff-appellee.
TATE, Justice.
The defendant Lee was convicted of second degree murder, La.R.S. 14:30.1 (1973), and sentenced to life imprisonment at hard labor. We must reverse. We find that the trial court erred in refusing to receive testimony as to the decedent's dangerous character in support of the accused's plea of self-defense, after the defendant had laid the requisite foundation by producing appreciable evidence that the decedent had made a hostile overt act against the accused. (Assignments of Error Numbers 1 through 5).
Context Facts
The defendant Lee and the victim Etchieson were part of a group of transient blacktop roof repairers, who with their families had moved from Mississippi to a mobile trailer park near Monroe, Louisiana, about a week before the offense charged. For the most part, they were related to one another by blood or marriage and moved from job-site to job-site over several southern states.
On the Sunday morning of the incident, Etchieson's daughter and Lee's son, both five years of age, had gotten into a fight while they waited near the road for the Sunday school bus. Etchieson came out of his trailer in anger and headed toward the children.
Lee's son ran towards his father, who was nearby standing with three other men preparing to go squirrel hunting. Lee had with him a 12-gauge shotgun.
Lee testified that Etchieson sprang at him and cut him with a knife and shouted, "I'm going to cut off your head." (The three state witnesses, the decedent's wife chiefly, testified Etchieson had no knife.[1]) Lee shot Etchieson, causing his almost immediate death. He immediately turned himself in to the police, who found a small *458 reddened slashmark (scratch) on his left chest beneath a ripped shirt.
The decedent was a big man, over six feet in height, weighing about 210 pounds. The accused was a much smaller man.
The defense upon which the accused relied was that he shot the decedent in self defense, in the reasonable belief that his own life was in danger. The defendant Lee was permitted to describe his own difficulties with the decedent Etchieson and to testify to a violent act he had seen him commit; but state objections were sustained to questions asked of him and of another defense witness which prevented him from attempting to establish the decedent's dangerous and violent character. For reasons to be set forth, these objections erroneously hampered to a substantial degree the evidence he tendered for his plea of self-defense.
Evidence as to the Decedent's Dangerous Character in Support of Plea of Self-Defense
In direct contradiction to the state's three eyewitnesses, the first defense witness testified that she had seen the victim make two or three jumps toward defendant and swing at him with "something". After he was shot, the victim staggered back and dropped a knife.
The second defense witness testified that immediately after the shooting, she saw a knife laying on the ground beside the victim.
The defense counsel then attempted to elicit testimony from this witness as to the victim's dangerous character and reputation.[2] The trial court sustained the state's objection to the introduction of this testimony. Similarly, when the defendant took the stand and attempted to respond to questions concerning his own knowledge of the victim's dangerous history,[3] the trial judge refused to admit such testimony.
The evidence was sought in support of a plea of self-defense, authorized by La.R.S. 14:20: "A homicide is justifiable: (1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger * * *."
Evidence of the decedent's dangerous character or of his threats against the accused may be admissible in support of this plea of self-defense, provided that the accused first produces evidence that the decedent had made a hostile demonstration or overt act against the accused at the time of the incident. See La.R.S. 15:482 (quoted below).
As explained in State v. Brown, 172 La. 121, 133 So. 383, 386 (1931), summarizing the well-settled principle: "An overt act is a hostile demonstration of such character as to create in the mind of a reasonable person the belief that he is in immediate danger of losing his life or of suffering great bodily harm. The term `overt act,' as used in connection with prosecutions for murder where the plea of self-defense is involved, means any act of the deceased *459 which manifests to the mind of a reasonable person a present intention on his part to kill defendant or do him great bodily harm."
As amended by Act 239 of 1952, La.R.S. 15:482 provides: "In the absence of evidence of hostile demonstration or of overt act on the part of the person slain or injured, evidence of his dangerous character or of his threats against accused is not admissible." (Italics ours.) The 1952 amendment specifically permitted dangerous character evidence, if "evidence" instead of "proof" (the pre-1952 wording) was made of the overt act or hostile demonstration. See 13 La.L.Rev. 64 (1952).
Prior to the 1952 amendment, this court had held that by the pre-1952 wording the "proof" of the overt act must be established to the satisfaction of the trial judge before evidence of the decedent's dangerous character or of his threats against the accused could be received. State v. Terry, 221 La. 1109, 61 So.2d 888 (1952), 14 La.L.Rev. 226-28 (1953); State v. Tobias, 218 La. 226, 48 So.2d 905 (1950). State v. Thornhill, 188 La. 762, 178 So. 343 (1938); State v. Richardson, 175 La. 823, 144 So. 587 (1932); State v. Dreher, 166 La. 924, 118 So. 85 (1928). Chief Justice O'Niell repeatedly dissented from these rulings, strongly urging that by them the trial judge, by rejecting the credibility of defense witnesses on a merit-issue, was permitted to invade the trial jury's function of evaluating the evidence. See: 11 La.L.Rev. 231-32 (1951); Note, 2 La.L.Rev. 376 (1940).
The legislative intent reflected by the 1952 amendment was to overrule legislatively our decisions that permitted the trial judge's discretion to determine incredible the defendant's evidence of an overt act and thus, without jury evaluation of it to withhold from the jury evidence tendered by the defendant in support of his position that he was acting reasonably in self-defense. This is the explicit purport of the amendment, and the prior academic and judicial criticism of the former interpretation (unique to Louisiana) re-enforces our view that such was the legislative intent.
Despite the specific evidence by the first and second defense witnesses that the decedent had attacked the accused with a knife, the trial court did not permit the dangerous-character evidence to go to the jury, apparently upon its own credibility evaluation that the evidence was untruthful. As our trial brother stated, "In view of the uniformity of positive evidence from state's witnesses as to what had occurred and the absence of any weapon connected with the deceased, the Court was extremely doubtful that at this point in the trial there had been sufficient evidence to show an overt act or hostile demonstration by the deceased toward defendant at the time of the shooting." (Italics ours.)
The trial court thus committed error in its ruling, for it ignored the effect of the 1952 amendment. By it, when appreciable evidence is in the record relevantly tending to establish the overt act, the trial court cannot exercise its discretion to infringe on the fact-determination function of the jury by disbelieving this defense testimony and thus, deny the accused a defense permitted him by law. See: State v. McMillian, 223 La. 96, 64 So.2d 856 (1953); Pugh, 14 La.L.Rev. 226-28 (1953); 13 La.L.Rev. 64 (1952).
The trial court's ruling is inconsistent with such post-1952 decisions of this court, as State v. Harding, 307 So.2d 338 (La.1975), State v. Poindexter, 231 La. 630, 92 So.2d 390 (1957), and State v. McMillian, 223 La. 96, 64 So.2d 856 (1953). (In fairness to the trial court, however, we must admit that there were a series of post-1952 rulings by this court which repeated the pre-1952 formulation by which the trial court had discretion to reject the evidence as to an overt act; which decisions overlooked *460 without discussion the effects of the 1952 amendment.[4])
The statute and jurisprudence require that an overt act be established before the dangerous-character and threat evidence concerning the decedent may be introduced. La.R.S. 15:482. State v. Burkhalter, 319 So.2d 392 (La.1975); State v. Houston, 316 So.2d 724 (La.1975); State v. Jackson, 308 So.2d 265 (La.1975); State v. Walker, 296 So.2d 310 (La.1974); State v. Warren, 271 So.2d 527 (La.1973); State v. Rollins, 271 So.2d 519 (La.1973); State v. Robinson, 263 La. 25, 267 So.2d 182 (1972); State v. Cannon, 231 La. 877, 93 So.2d 200 (1957).
But, once the overt act is established, this type of evidence is admissible in support of a plea of self-defense in a murder prosecution for two distinct purposes: (1) to show defendant's reasonable apprehension of danger which would justify his conduct; and (2) to help determine who was the aggressor in the conflict. See: 11 La.L.Rev. 231 (1951); 1 Wigmore on Evidence, Sec. 63 (3d ed. 1940); McCormick on Evidence, Sec. 295, pp. 700-701 (2d ed. 1972).
When the evidence is introduced for the first purpose, it is admissible to show the accused's state of mind, based on what he himself knew of the decedent's reputation or threats. As explained in State v. McMillian, 223 La. 96, 64 So.2d 856, 857, reversing for refusal to permit introduction of evidence concerning specific prior acts between the parties, such evidence "was admissible and relevant to show the reasonableness of the defendant's fear of an impending attack or of suffering great bodily harm at the time of the homicide. It would have tended to negative intent and was thus relevant and admissible under [La.R.S.15:] Article 441 of the Code of Criminal Procedure, which provides: `Relevant evidence is that tending * * * to negative the commission of the offense and the intent.'" See also 2 Wigmore on Evidence, Sections 246, 247 (3d ed., 1940) and McCormick on Evidence, Section 295 (2d ed., 1972).
The reason for the overt-act foundation required to let in such evidence to prove aggression is explained by Wigmore, Section 63 at pp. 489-490: "There ought, of course, to be some other appreciable evidence of the deceased's aggression, for the character-evidence can hardly be of value unless there is otherwise a fair possibility of doubt on the point; moreover, otherwise the deceased's bad character is likely to be put forward to serve improperly as a mere excuse for the killing * * *. See also McCormick on Evidence, Sections 193, 295 (2d ed., 1972).
Based on these authorities, the trial court committed error in failing to permit the accused to elicit from a witness evidence as to the dangerous character of the accused and in failing to permit the accused to testify as to his own knowledge of prior acts by the decedent which manifested the decedent's dangerous character.
In the context of the facts, the series of questions to the first defense witness (Footnote 2) were to develop incidents of violence known to all members of the closelyknit family group with which both the decedent and the accused had lived in various places over the preceding year or so; while questions 2 and 3 (Footnote 2), as asked, were subject to objection as not tied in more specifically to this aim, the effect of sustaining the state's objection was to terminate examination of this witness to this *461 end. Question 1, however, sought to elicit evidence as to the decedent's known dangerous character, relevant both on the aggressor issue and on the accused's state of mind.
It is true that questions two through five (see Footnotes 2 and 3) sought to elicit testimony of specific acts by the victim. The traditional rule is that character evidence is established by general reputation, not by specific acts. La.R.S. 15:479.
Nevertheless, the evidence of specific acts is relevant not to show the victim's character, but to show the defendant's state of mind. See State v. McMillian, 223 La. 96, 64 So.2d 856 (1953); 2 Wigmore on Evidence, Sec. 248 (3d ed., 1940). The accused's state of mind (his reasonable belief of his own danger) is a material issue in this case. La.R.S. 14:20.
Therefore, though prior threats and violent acts, (whether against the accused or against others) might be inadmissible as character evidence, they are admissible if defendant knew of them at the time of the offense.[5] As the objections of the state and the rulings of the trial court show (with regard to Question 1 also), the defendant was denied the right to produce evidence of prior dangerous acts of the decedent unless directed against the accused himself or else witnessed by the latter.
The erroneous rulings had the effect of depriving him of substantial evidence in support of proving his own state of mind, that is, his reasonable belief that he himself, from what he knew or had heard of the decedent's violent propensities, was in danger of serious bodily harm when the decedent came up to him as a result of the fight between their two children.
Harmless Error?
Alternatively, the state argues that the rulings, if erroneous, were harmless. The state points out that the accused was permitted to testify as to his own difficulties with the decedent and as to a violent incident he himself witnessed.
Nevertheless, the effect of the rulings was to deprive the accused of the opportunity to establish the known dangerous character of the decedent, insofar as resulting from a pattern of violent incidents involving others in the itinerant group besides the accused himself (whose testimony, in the absence of corroboration, the jury might regard as self-serving). As noted above, the accused had a statutory right to present such evidence. The substantial curtailment of this right cannot be regarded as harmless. See La.C.Cr.P. art. 921; Pugh, Louisiana Evidence Law 550-65 (1974).
We must therefore reverse, since the defendant was erroneously denied the right to introduce evidence in support of his claim of self-defense. In reversing, we acknowledge that, except for this error, the state's conduct of the trial was fair and dispassionate.
Other Assignments
Since the issues are not likely to recur, we will do no more than note two other substantial issues raised: Assignment 9, the denial of a new trial despite production of two previously unavailable witnesses who substantially contradicted trial testimony of the decedent's wife, the state's chief witness (see Footnote 1); and Assignment 6, the refusal to permit a demonstration before the jury by defense counsel of the operation of the shotgun, cf. State v. Roy, 220 La. 1017, 58 So.2d 323 (1952).

Decree
For the reasons assigned, we reverse the conviction and sentence, and we remand for a new trial in accordance with law.
Reversed and remanded.
*462 SANDERS, C. J., and MARCUS, J., dissent.
SUMMERS, J., dissents and assigns reasons.
SUMMERS, Justice (dissenting).
The "Context Facts" of the majority opinion states that "Etchieson came out of his trailer in anger and headed toward the children," and "Lee's son ran toward his father . . . ." and, further, after the defendant turned himself in to the police, he was found to have "a small reddened slashmark (scratch) on his left chest beneath a ripped shirt."
Although this statement of fact serves to bolster defendant's plea of self-defense, it should be noted that these facts are all in dispute. The more preponderating and credible testimony (some from disinterested witnesses) supports a finding that Etchieson did not come out of his trailer in anger. He headed toward his wife rather than the children; and his purpose was to get his wife back to their trailer. Immediately thereafter he was shot as he stood outside the trailer door. Although defendant was later observed to have a scratch on his chest and a torn shirt, these were not necessarily connected with the claim that defendant had been attacked by decedent with a knife.
The Court has accepted a version of the facts which was not established at the trial and rejected by the trial judge and jury.
Despite the erroneous acceptance of the facts concerning hostile demonstration, which neither the trial judge nor jury considered acceptable, the Court has erroneously considered objections to questions seeking to elicit evidence of the victim's dangerous character.
Section 482 of Title 15 of the Revised Statutes permits evidence of the dangerous character of the victim in such a case when a hostile demonstration has been shown. Assuming that a hostile demonstration has been shown here, the evidence of dangerous character must be legal evidence admitted in accordance with rules established for its admissibility. When an effort is made to introduce evidence of the dangerous character of the victim and the question propounded is objected to because it seeks hearsay or other improper testimony, the objectionable character of the question is not excused by the fact that a hostile demonstration or overt act on the part of person slain has been established.
The State objected three times during the whole of Louise Ward's testimony. Each of the objections were sustained.
First, the question was asked, "Did you everever hear or ever know of anydangerous characteristic of Lane's?" This question solicits information received by the witness from other persons regarding specific instances of Lane's dangerous characteristics. Dangerous character depends upon the general reputation that a man has among his neighbors, not upon what particular persons think of him. La.R.S. 15:479; State v. Harris, 258 La. 720, 247 So.2d 847 (1971). There is a noticeable lack of foundation for admission of evidence of the deceased's general reputation in the community. And, surely, the State is not required to permit a witness to testify regarding things she supposedly heard about the victim from others. La.R.S. 15:434, 463. The evidence of dangerous character referred to in Section 482 of Title 15 must mean competent, legal, admissible evidence, not hearsay. The same is true of the question: "On October the 6th, at that timedidhad you ever heard of any relevant acts that he had committed on anyone?"
Secondly, these two questions were objected to by the State: "Had you ever seen Lanedo anything violent?" and "Did you ever see him do anything physical to anyone?" Questions which are phrased in terms of "ever see", "do anything" and "to anyone" open the door for witnesses to answer as they see fit. No *463 limitations are placed on the response solicited and the opposing counsel has no way of anticipating the character or relevance of the replies. In fact, the majority opinion recognizes that these two questions are vague and indefinite and subject to objection, but held that the State did not object on that ground, stating that "the thrust of the State's objection was that the witness could not be asked whether she had seen the decedent do any particular violent act in proof of his dangerous character."
To the question "Had you ever seen Lane . . . do anything violent?" the witness answered "Yes, sir". The State's attorney then objected, saying: "I'm going to object to this, also . . . this is really not proper . . . character testimony. . . from the witness. I submit it's improper." The trial judge then ruled "Well, it's a very vague question, the objection will be sustained." In my view, the "thrust" of the State's objection was not, as this Court found it to be, relative to this question. Nor was the "thrust" of the State's objection as the Court found it to be relative to the other question.
And I cannot agree that defendant was deprived of substantial evidence in support of proving his own state of mind from what he knew or had heard of decedent's violent propensities. The record plainly shows that defendant was not limited in his testimony concerning what he asserted he knew of the victim's violent propensities. He testified extensively in this regard.
The Court by a bare majority has overruled a number of recent decisions of this Court to deny this Court's interpretation of Section 482 to mean credible and sufficient evidence. The effect of this decision is to permit a defendant to establish a hostile demonstration by his simple uncorroborated statement to that effect, or by the statement of a single witness whose credibility has been destroyed, for in either instance there is "evidence" of hostile demonstration. This opinion makes any incredible statement "evidence" within the contemplation of Section 482. I would adhere to the decisions overruled by the majority opinion.

ON REHEARING
DIXON, Justice.
Defendant was convicted of the second degree murder of Lane Etchieson, a violation of R.S. 14:30.1, and was sentenced to life imprisonment. From this conviction and sentence he appeals, perfecting nine assignments of error.
On original hearing we held the trial court erred in ruling that defendant had not laid the proper foundation for the admissibility of evidence of the victim's dangerous character and threats against the accused. (R.S. 15:482). Rehearing was granted to reconsider this holding.
In view of the evidence adduced at trial and the 1952 legislative change of R.S. 15:482, we reinstate our original opinion. A review of the transcript before us reveals the following testimony relevant to the determination whether there was "evidence" of an overt act or hostile demonstration by the victim against the accused.
State witness Brenda Walker, formerly Brenda Etchieson: At the time of the shooting, the Etchieson family had been living for about a month in the Monroe Mobile Home Trailer Park, where defendant's family also lived. On the Sunday morning of October 6, 1974, one of the Etchieson children argued and fought with one of the Lee children. The then Mrs. Etchieson interrupted them and an argument ensued between her and defendant's wife. During this argument Mrs. Etchieson heard her trailer door open and she turned to see her husband coming outside. Realizing he was coming to tell her to stop the argument, she turned again to face defendant's wife. In this posture she could no *464 longer see her husband. While still arguing with defendant's wife, she heard a gun discharge and turned in time to see her husband grab his side and fall to the ground. Though she could not remember whether defendant was armed when her husband exited the trailer, she testified she saw no weapon in her husband's hand. After the shot had been fired, she ran for help. In response to State questioning she testified she had never seen her husband engage in any type of struggle with defendant.
State witness Trooper B. K. Bennett: While he was on duty he was hailed by a vehicle containing several people. He stopped, got out of his car and met the occupants. Defendant, who had been in the car with his shotgun, ran toward Bennett shouting that he "thought he had shot someone." Bennett took the shotgun from defendant, brought him inside the nearby police station and questioned him. Though defendant was hysterical and disheveled, he told Bennett where the shooting had occurred. Bennett noticed defendant had a "red mark" on his stomach and that his shirt was torn.
State witness Deputy Thomas Reighney: Though he investigated the scene of the shooting, Reighney did not see defendant until "past noon" at the parish jail. Defendant did not have a shirt on, and he had a small scratch near his chest plate.
State witness D. O. Sinclair: As Sinclair was driving by the trailer park, he heard the noise of a "backfire or shotgun" and saw a young lady running along a service road. He drove his car up to her and she told him her husband had just been shot at the nearby trailer park. He jumped out of his car and ran to the spot where Etchieson was lying. In the first moments of his arrival, only he and another man were in the immediate area of the deceased; a crowd soon gathered. When it appeared that the gathering crowd might cause further trouble, Sinclair left to call the police. He saw no weapon in the area where Etchieson was lying.
State witness Elzie Woods: Woods lived in the trailer park. He was outside his trailer and heard "loud talking." He turned to look in the direction of the disturbance and saw one of two men pump his gun (Woods demonstrated this pumping action for the jury) and fire at the other. After the shooting he went inside, phoned the police and remained inside.
State witness Mrs. Lorena Woods: She was outside her trailer, heard "loud talking," turned to the direction of the noise, and saw one man pump his gun and shoot another. She did not approach the body; she went back inside her trailer.
Defense witness Mrs. Goldie Mae Owens: Mrs. Owens heard women arguing and went outside her trailer. She then saw Etchieson come out of his trailer yelling at defendant. Etchieson took "two or three jumps" over to where defendant was standing and was "swinging at him with something." Defendant shot him. After the gun discharged, Etchieson fell to the ground and dropped a knife. Mrs. Owens did not see the deceased actually strike defendant, but she did see him try. Mrs. Owens gave this same account of facts to Deputy Reighney when he interviewed her.
Defense witness Mrs. Louise Ward: While inside her trailer, Mrs. Ward heard a gun discharge and people scream. She went outside and saw Etchieson lying on the ground. Next to him was a regular, brown kitchen knife. She did not give this information to investigating officers; however, they did not question her.
Defendant Sammy Lee: After his and Etchieson's children and wives argued, Lee approached the deceased, apologized, and told him he would spank his child for misbehaving. Etchieson grabbed defendant and tore his shirt before he could free himself. Then defendant ran to his nearby truck, got his shotgun and commenced walking back to his trailer. Meanwhile, Etchieson had returned to his trailer. As defendant proceeded, Etchieson came outside, ran toward defendant and cut him on the wrist as *465 he sought to protect himself. Lane Etchieson shouted to defendant that he was "going to cut [his] head off," and defendant shot him. Defendant firmly believed that Lane intended to kill him. After the shooting, defendant ran down the road in a state of panic and eventually hailed down a state trooper.
From a review of the entire testimony taken at trial, it is clear that defendant should have been allowed to introduce evidence of Etchieson's dangerous character and threats against defendant. After Mrs. Owens testified, it cannot be said that there was an "absence of evidence" of a hostile demonstration or "overt act." R.S. 15:482.
The rulings complained of deprived the defendant of an opportunity to present to the jury important evidence which might have corroborated his own testimony about his state of mind at the time of the shooting.
The State also complains of the "objectionable nature" of the questions the defense was precluded from asking. We affirm our original holding, to the effect that questions which might be objectionable and inadmissible as character evidence, might, nevertheless, be admissible if relevant to prove the state of mind of the defendant. See State v. McMillian, 223 La. 96, 64 So.2d 856 (1953).
Accordingly, our original opinion is reinstated, the conviction and sentence are reversed, and the case is remanded for a new trial in accordance with law.
MARCUS, J., dissents and assigns reasons.
SANDERS, C. J., dissents and assigns written reasons.
SUMMERS, J., dissents and assigns written reasons.
MARCUS, Justice (dissenting).
Even assuming credible evidence of hostile demonstration or of overt act on the part of the victim, thereafter, in my opinion, only evidence of the victim's dangerous character (general bad reputationnot specific acts) and of his threats or hostile acts against the accused (not third persons) are admissible. In my view, the questions asked here were improper and the ruling of the trial judge was correct. Accordingly, I respectfully dissent.
SANDERS, Chief Justice (dissenting).
Assuming there was credible evidence of a hostile demonstration by the victim against the defendant, the real problem in the instant case is whether the trial judge properly rejected the questions directed to the witness and to the defendant.
The questions directed to the witness were as follows:
"Q. `Did you ever . . . ever hear or ever know of any . . . dangerous characteristics of Lane's?'
"Q. `Had you ever seen Lane . . . do anything violent?'
"Q. `Did you ever see him do anything physical to anyone?'"
The questions to the defendant were as follows:
"Q. At the time of the incident, `had you ever heard of any violent acts the had committed on anyone?'
"Q. `Do you know of any overt act that Lane Etchieson had ever committed towards anyone?'"
The statutes governing proof of dangerous character provide:
LSA-R.S. 15:482:
"In the absence of evidence of hostile demonstration or of overt act on the part of the person slain or injured, evidence of his dangerous character or of his threats against accused is not admissible."
LSA-R.S. 15:479:
"Character, whether good or bad, depends upon the general reputation that a *466 man has among his neighbors, not upon what particular persons think of him."
LSA-R.S. 15:479 embodies a long-established rule that dangerous character must be proved by general reputation and not by specific acts. State v. Ricks, 170 La. 507, 128 So. 293 (1930); State v. Sharpe, 170 La. 69, 127 So. 368 (1930); State v. Fontenot, 50 La.Ann. 537, 23 So. 634 (1898).
From the statutes, it can be plausibly argued that proof of the victim's dangerous character is restricted to general reputation and his threats against the accused. If the statutes are so construed, neither the questions directed to the witness nor those directed to the defendant are admissible.
However, in State v. McMillian, 223 La. 96, 64 So.2d 856 (1953), this Court held that evidence of the victim's prior assaults upon the defendant and threats communicated to him are admissible in a self-defense case to show the defendant's state of mind. Relying solely on State v. McMillian, supra, the majority holds that the questions here represented proper interrogation. In so holding, I think the majority erred.
The three questions directed to the defense witness are inadmissibly broad and vague. They are directed to the victim's specific acts of violence toward third parties occurring at anytime in the past, whether known to the defendant or not. The first question also calls for reports of acts of violence that the witness has heard.
It is well established that evidence of specific difficulties between the victim and third parties, at least when not shown to be related to the case, is inadmissible. State v. Fontenot, supra; 40 C.J.S. Homicide § 210, p. 1119; Wharton's Criminal Evidence § 163, p. 298 (13th ed., Torcia, 1972).
As the trial judge noted, the questions are entirely too general and vague to determine relevance.
The questions directed to defendant raise a more difficult issue. Broadly posed, the issue is whether the victim's specific acts of violence against third parties known to the defendant are admissible to show the defendant's state of mind when self defense is the issue.
There is a split of authority as to whether the defendant may offer evidence of prior acts of violence on the part of the victim toward third parties, known to the defendant, to show his state of mind or apprehension of harm. See Jones v. State, 182 Md. 653, 35 A.2d 916 (1944); Dempsey v. State, 159 Tex.Cr. 602, 266 S.W.2d 875. Contra, Newsome v. State, 197 Miss. 797, 20 So.2d 708 (1945); People v. Soules, 41 Cal.App.2d 298, 106 P.2d 639 (1940); State v. Bozarth, Mo., 361 S.W.2d 819 (1962).
In People v. Soules, supra, the California court stated:
"It is almost uniformly held that proof of the turbulent, violent and dangerous character of a person, offered for the purpose of concluding therefrom that he was more likely to have been the aggressor in an affray which resulted in his death, must be established by evidence of his general reputation for peace and quiet in the community where he resides. The same rule is usually applicable to evidence of a violent nature adduced in assault and murder cases to corroborate the defendant in his claim that he acted in necessary self-defense, believing from the circumstances of the particular case, as a reasonable man, that he was about to be assaulted and that he was likely to be killed or to receive great bodily harm."
Louisiana has previously aligned itself with those states that exclude evidence of prior acts of the victim against third parties. State v. Boudreaux, 221 La. 1078, 61 So.2d 878 (1952); State v. Fontenot, supra.
The majority relies solely upon State v. McMillian, supra. That case, however, is inapposite, because it involved prior assaults of the victim upon the defendant, who had pleaded self-defense.
*467 In my opinion, the majority does not adequately treat the question. Assuming that a rule of admissibility is adopted, such a rule undoubtedly has boundaries.
As the Court stated in People v. Soules, supra:
"It is, however, apparent that even if such evidence is competent, under certain circumstances, it should be received with caution for the reason that it is remote, weak, collateral to the real issue, confusing to the jury, unsatisfactory and difficult to rebut. To entitle such evidence to any substantial weight it would be necessary to adduce proof of the circumstances of each previous affray to fairly determine whether the deceased was warranted in acting as he did."
Under a rule of admissibility, the questions addressed to the defendant here are far too general and vague. As the trial judge noted, the questions call for hearsay reports of violent acts by the victim against third parties committed at remote times and places. Such broadly phrased questions would introduce at the trial collateral issues confusing to the jury and harmful to the administration of justice. In my opinion, the trial judge properly excluded the questions.
It is to be observed that following the ruling, the trial judge allowed the defendant to testify as to the victim's prior threats and hostility toward him. He also allowed the defendant to testify that he had witnessed an act of violence committed by the victim on his (the victim's) wife. The record reflects that state of mind of the defendant was adequately explored.
For the reasons assigned, I respectfully dissent.
SUMMERS, Justice (dissenting).
I dissent for the reasons assigned by me to the original opinion and for the reasons assigned by the Chief Justice to the majority opinion on rehearing.
NOTES
[1] However, on the motion for new trial, two witnesses were produced, allegedly not discoverable by the exercise of due diligence prior to the trial. (They were in Texas and Florida then, neither of them being in Louisiana from immediately after the shooting.) They testified respectively that (a) one saw the knife in Etchieson's hand and saw Etchieson's wife pick it up and throw it in the back of a pickup after the shooting, and (b) one heard Etchieson's wife admit (contrary to her trial testimony) that her husband had cut Lee prior to the shooting.
[2] Q. No. 1: "Did you ever . . . ever hear or ever know of any . . . dangerous characteristics of Lane's?"

Q. No. 2: "Had you ever seen Lane. . . do anything violent?"
Q. No. 3: "Did you ever see him do anything physical to anyone?"
These questions form the basis of Assignments 1-3. The second and third questions may have been subject to objection as vague, but the thrust of the state's objection was that the witness could not be asked whether she had seen the decedent do any particular violent act in proof of his dangerous character.
[3] The questions asked of the defendant himself, to which objections were sustained (Assignments 4 and 5), were:

Q. No. 4: At the time of the incident, "had you ever heard of any violent acts he had committed on anyone?"
Q. No. 5: "Do you know of any overt act that Lane Etchieson had ever committed towards anyone?"
[4] Although the results may have been correct in some or all of the following cases, the expressions in them repeating the pre-1952 discretion of the trial court to exclude self-defense testimony are overruled as incorrect: State v. Groves, 311 So.2d 230 (La.1975); State v. Weathers, 304 So.2d 662 (La.1974); State v. Mitchell, 290 So.2d 829 (La.1974); State v. Foreman, 256 La. 999, 240 So.2d 736 (1970); State v. Cooper, 249 La. 654, 190 So.2d 86 (1966); State v. Knight, 227 La. 739, 80 So.2d 391 (1955).
[5] However, as noted above, such evidence is inadmissible until the issue of self-defense has been raised by the introduction of evidence of the victim's overt acts or hostile demonstration at the time of the offense.