335 So.2d 430 (1976)
STATE of Louisiana
v.
Katherine GREEN.
No. 57151.
Supreme Court of Louisiana.
June 21, 1976.
Dissenting Opinion July 29, 1976.
C. O. Brown, Alexandria, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Edwin O. Ware, Dist. Atty., L. Paul Gianfala, Asst. Dist. Atty., for plaintiff-appellee.
DIXON, Justice.
Defendant was convicted of aggravated battery, a violation of R.S. 14:34, and was sentenced to three years imprisonment at hard labor. From this conviction and sentence she appeals, raising sixteen assignments of error.
Assignments of Error Nos. 1, 2, 4, 6 and 16
These assignments were raised when defendant sought to introduce evidence of the victim's threats against the accused, but was prevented by the trial court's finding *431 that a proper foundation had not been laid. The trial court's determination was based on the following relevant testimony.
State witness Elbert Green: Green was married to defendant but lived separate and apart from her. As he and Foster Harris, to whom he refers as his foster son, were walking toward Harris' bail bondsman's office, they saw defendant and she asked them over to her nearby house. She spoke to Green "like she always do," kissed him on the cheek, and asked them inside her home. There was another man already in the house, but Green did not know him. Once in the front room, defendant told Green she wanted part of the social security disability income he received each month. He told her he had no money, and she began "cutting on (him) with a knife." Green had no idea from where defendant had produced the knife, and said he could not run away because the front door was fastened. The next thing Green could remember was being taken to the hospital where he had more than one hundred stitches put in his head. Green had a history of seizures which caused him to become unconscious, and he remembered having one in the hospital while being treated. Prior to that night he had been "cut" on "a bunch" of occasions.
State witness Foster Harris: Twenty-three years old, he referred to Green, who helped raise him, as his stepfather. Harris and Green were walking down Lee Street when defendant asked them into her home. She immediately began to ask Green about money, and he denied having any money. They started to argue and went into the kitchen. Defendant told "Chewing Tobacco," the other person present in defendant's home, to lock the front door; he did. Harris unlocked the door and returned to the kitchen to find defendant hitting Green in the head with a knife. Harris asked Green to leave, and defendant interjected that she would not let him. She then called "Chewing Tobacco" to come into the kitchen to hold Green while she cut him, and at that time Harris ran from the house and called the police. Later, Harris returned with Police, knocked at defendant's door and asked to see Green. Defendant answered through the closed front door that Green had gone, but Harris told police Green was too badly hurt to have left. The police then began knocking and "Chewing Tobacco" opened the door after about two minutes. On cross-examination Harris admitted he had been convicted of two burglaries and of passing a forged check.
State witness Officer Ralph Creel: On May 16, 1975 he received a call from a person who reported a woman was cutting his stepdaddy. He and Sergeant Holmes met Harris and went to defendant's home. While the others were knocking at the front door, Creel went around to the back door. From this position he heard people inside "whispering, rumbling around in the pots and pans," and "turning on the water." After waiting awhile, Creel returned to the front door, and Robert Bush opened the door to let them in. After opening the door, Bush sat in a living room chair and did not talk to the officers. They proceeded into the middle bedroom and found Green lying on the floor with blood on and around him; an ambulance was summoned. From the look of the floor, it appeared as though someone had tried to mop the floor, but had only smeared the blood around. Greel fully searched the dwelling and did not find defendant, though he did find a mop and bucket. The mop was standing in the bucket, submerged in bloody water. There were footprints on the floor. Officers Holmes and Creel searched underneath the kitchen sink, where pots and pans were stored, and found a butcher knife with blood on it.
State witness Officer Ronald Holmes: Holmes responded to a call concerning a "cutting." When he knocked at the door he heard a woman's voice ask who was knocking; they identified themselves, and about two minutes later the door was opened by Robert Bush. When asked, Bush said he didn't know what had happened. They proceeded to the bedroom, found Green lying on the floor covered with blood, and began *432 to search for a woman Harris had told them did the "cutting." They searched the house completely and found no one; a bloody knife was found under the sink by the kitchen utensils, and there was blood in the sink.
State witness Detective Daren Coutee: Coutee interviewed Robert Bush the night of the incident. Bush told him Green came to the house but that he (Bush) saw nothing happen, that he heard a commotion in the bedroom but did not leave his chair because he was "used to this scuffling" and didn't get involved, that he never saw defendant cut Green, and that all he knew was that an ambulance came to the house and took Green away. Bush could not read or write so he put his "X" on the statement after Coutee read it back to him. Defendant was arrested on May 22, 1975, six days after the incident.
Defendant Katherine Green testified on her own behalf. She had just returned from outside her house when she heard a voice call to her. She asked who it was and the voice said, "Elbert Green, Cooter, your husband." She entered the house and Green and Foster Harris followed her in, uninvited. Green shoved her down onto the floor and cut her on the back with a butcher knife. She rolled out from under him, ran to the kitchen to get a mop and knocked the knife from his hand with the mop. She grabbed the knife and ran to the bedroom where she kept swinging the knife back and forth, but Green "kept on coming up on me and that's how he got cut." She was frightened. At this time Foster Harris ran from the house. When Green fell to the floor, defendant threw the knife on the floor and "hid up in the closet." She thought Green "probably" had a seizure when he was lying on the floor; having lived with Green, she had seen him have seizures "plenty" of times and knew he would fall down and "just kick like a mad dog foaming at the mouth."
When police came, she could hear them in the room but could not understand them because she was "too scared;" she stayed in the closet the entire time they were in her house. She was arrested about midnight May 21, 1975 and she didn't understand why, when she was arrested, police told her they had been looking for her because she had always been in her house.
During the incident Robert Bush was in the front room of her shotgun style house.
She showed the jury several cuts on her back, at least one of which she testified was from her first husband (Green was her second husband). Though at the preliminary hearing she said the knife she threw on the floor did not have blood on it, she testified at trial that it did have blood on it.
Defense witness Robert Bush, also known as "Chewing Tobacco," shared a house with defendant. On the night of May 16, 1975 Bush was inside their house when defendant entered and was followed by Green and Harris. Inside, Green pushed her down, pulled a knife from his pants and "hit" her with it; defendant made it to the kitchen, got a mop and knocked the knife out of his hands. She was swinging it back and forth and Green "kept walking up on her." After Green fell to the floor, defendant just "stood up and looked" at Green, and when police came "she disappeared" and he did not know where she went. Bush saw police search the entire house, "closets, kitchen and everywhere," and knew they did not find defendant. Until the police arrived, Bush never got out of his chair, he remained watching television. Bush denied giving police a statement to the effect that he did not see anything. He admitted three convictions for burglary. After the incident and until trial he and defendant continued living together.
Defendant does not deny she cut Elbert Green; she claims she did so only in self-defense. R.S. 14:20. In support of her claim of justification, she sought to introduce evidence of threats against her allegedly made by Green. Finding that no proper foundation had been laid, the trial court gave the *433 following reasons for refusing to admit evidence of threats by the victim:
"BY THE COURT: The question before the Courtthis is with respect to whether or not an adequate foundation has been laid to permit defendant to show prior threats, and under Title 15 of the Louisiana Revised Statutes, Section 482, there must be some showing of overt acts before they are admissible. The Court is given discretion to determine whether or not there has been a sufficiency of evidence to show that. It also includes a credibility evaluation and at this time it is the ruling of the Court that a sufficient foundation has not been shown. The Court relies on the cases of State vs. Foreman, 256 La. 999, 240 So.2nd, 736; State vs. Mitchell, [La.] 290 So.2nd, 829; State vs. Walker, [La.] 296 So.2nd, 310."
Evidence of the victim's dangerous character or threats against the accused supports a plea of self-defense because it is relevant to show that the victim was the aggressor and because it is relevant to show that defendant's apprehension of danger was reasonable. State v. Lee, La., 331 So.2d 455, Rendered November 3, 1975, reaffirmed on rehearing March 29, 1976; 1 Wigmore, Evidence § 63 (3rd ed. 1940); McCormick on Evidence § 295 (2d ed. 1972).
The foundation for the admissibility of such evidence is found in R.S. 15:482:
"In the absence of evidence of hostile demonstration or of overt act on the part of the person slain or injured, evidence of his dangerous character or of his threats against accused is not admissible."
And the term "overt act," as used in connection with prosecutions where the plea of self-defense is involved, means any act of the victim which manifests to the mind of a reasonable person a present intention on his part to kill or do great bodily harm. See State v. Brown, 172 La. 121, 133 So. 383 (1931).
Prior to 1952 R.S. 15:482 required "proof" of an overt act before evidence of the victim's threats was admissible. We then held the overt act must be established to the satisfaction of the trial court. State v. Terry, 221 La. 1109, 61 So.2d 888 (1952); State v. Tobias, 218 La. 226, 48 So.2d 905 (1950).
But the legislature amended R.S. 15:482 in 1952 to require "evidence" rather than "proof" of an overt act. In State v. Lee, supra, we held this amendment meant that ". . . when appreciable evidence is in the record relevantly tending to establish the overt act, the trial court cannot exercise its discretion to infringe on the fact-determination function of the jury by disbelieving this defense testimony and, thus, deny the accused a defense permitted him by law."
This is precisely what the trial court in the case before us did: he exercised a "credibility evaluation" to refuse defendant the right to have the jury determine the merits of her plea of self-defense.
Both defendant and Robert Bush testified Green attacked defendant first and that she acted only to protect herself; whereas both Green and Foster Harris testified defendant attacked Green without justification. Testimony by investigating officers also may have contradicted that of defendant and Bush. However, it cannot be said that there is the "absence of evidence of hostile demonstration or of overt act on the part of the person . . . injured" required by R.S. 15:482 to make evidence of the victim's dangerous character or threats against the accused inadmissible.
In making his ruling, the trial court relied upon three cases rendered by this court after the 1952 amendment. In the first two, State v. Foreman, 256 La. 999, 240 So.2d 736 (1970) and State v. Mitchell, 290 So.2d 829 (La.1974), evidence of the victim's dangerous character and threats against the accused was held inadmissible because of the trial court's "reasonable evaluation of the credibility of the witnesses and the sufficiency of the evidence." These cases were expressly overruled by our decision in State v. Lee, supra. In the *434 third case relied on by the trial court, State v. Walker, 296 So.2d 310 (La.1974), evidence of the victim's threats against the accused was held inadmissible because the foundation evidence tended to show only that the victim walked near the accused; hence this evidence did not tend to show an overt act or hostile demonstration. The holding of Walker does not support the trial court's ruling in the case before us.
By refusing to admit evidence of the victim's threats against the accused on the basis of the credibility of the witnesses, the trial court ignored the 1952 amendment and applied the pre-1952 test.
For the reasons expressed herein, defendant's conviction and sentence are reversed and the case is remanded to the trial court for further proceedings not inconsistent with this opinion.
SUMMERS, Justice (dissenting).
I adhere to the reasons assigned by this Court in State v. Groves, 311 So.2d 230 (La. 1975), at page 238, declaring,
"It is not any testimony which will satisfy the requirement of Section 482 of Title 15 that there be `evidence' of hostile demonstration or overt act. It does not become evidence unless, in the opinion of the trial judge charged with determining the weight of the testimony, it is credible and competent to establish the facts which are necessary to constitute a hostile demonstration or overt act. Hostile demonstration or overt act must moreover be of such a character that they indicate a purpose to do defendant serious bodily harm. If the testimony is so incredible because of its self-serving character and the contradictions established against it that it has no weight in the judgment of the trial judge it is, in effect, no evidence. Thus, to be evidence, the testimony of hostile demonstration or overt act must be such that its reception would establish hostile demonstration or overt act, otherwise it is not evidence of these facts." See also II Wigmore on Evidence § 246 (3d ed. 1940).
The case at bar overrules the proposition announced in State v. Lee, 331 So.2d 455 (La.1975), that "evidence" as used in Section 482 meant that ". . . when appreciable evidence is in the record relevantly tending to establish an overt act, the trial court cannot exercise its discretion to infringe on the fact determination function of the jury by disbelieving this defense testimony. . . ." For, in the case at bar, there is no "appreciable" evidence.
Under the decision in the case at bar, evidence of the dangerous character of the person slain or injured, or of his threats against the accused, will always be admissible. For, under this decision the mere statement of the defendant that the victim raised his hand will suffice as "evidence" of a hostile demonstration or overt act.
I do not believe that the Legislature, by inserting "evidence" in Section 482, intended such a result.
This brings us to Wigmore's assertion that unless our law is to become a mass of quibbles which no practitioner can master and every murderer will welcome, the question whether an overt act is sufficiently evidenced to lay the foundation for the reputation evidence must be left in the hands of the trial judge. II Wigmore on Evidence § 246 (3d ed. 1940).
I respectfully dissent.