JOY COSSICH LOBRANO, Judge.
11 Defendant, Burtell Thomas, was charged by grand jury indictment with second degree murder, a violation of La. R.S. 14:30.1. He was tried by a twelve-person jury and found guilty as charged. The trial court denied defendant’s motion for new trial and sentenced him to life imprisonment at hard labor, without benefit of probation, parole, or suspension of sentence. Defendant now appeals.
FACTS
Defendant was convicted of second degree murder for the shooting death of Lashaun Butler (“Lashaun”).
At trial, New Orleans Police Department (NOPD) Assistant Police Communications Supervisor Giselle Roussel identified an incident recall, F33347-09, from June 25, 2009, at approximately 5:56 p.m., reflecting a homicide by shooting at 2228 Cadiz Street. She also identified a recording of the 911 call, which was played for the jury.
NOPD Officer Christopher Avist and his partner, Officer Brian Mulvey, testified that they arrived at the scene of the shooting at 6:00 p.m. and secured the area. Officer Heidi Williams testified that she arrived shortly thereafter and processed the crime scene for the Crime Lab. Officer Williams identified her |2crime report and the photographs she took of the crime scene. According to her, she collected four spent cartridge casings, including at least one .45 caliber one. She also emptied and collected as evidence one forty-ounce “Olde English 800” beer bottle, which was full and packaged in a brown paper bag when discovered at the scene.
NOPD Detective Erbin Bush, the lead homicide detective assigned to the case, testified that the scene was predominantly confined to a residence, with the victim located on the porch. Based on an interview of two witnesses, he learned the street name of the shooter and his possible place of employment, Wal-Mart. He directed Dets. Pardo and Beckett to proceed to the Wal-Mart, located on the West-bank, where they were able to ascertain defendant’s name. Det. Pardo compiled a photo lineup, which Det. Bush presented to a witness, Pearl Williams, who identified defendant as the person she saw leaving the scene. An interview of a second witness, DeAndrea Lazard, the victim’s girlfriend, revealed that she had known the shooter as “Birdie” for approximately five years and that she had been in his company socially on countless occasions. Ms. Lazard identified a single photograph of defendant to confirm that this was the person she knew as “Birdie.” Det. Bush obtained an arrest warrant, and defendant subsequently turned himself in to police, *669 surrendering a .45 caliber handgun at that time.
On cross examination, Det. Bush further testified that he saw two beer bottles on the scene, one on the porch, which was broken, and one on the ground in the same area where the cartridge casings were located. Both bottles were packaged in brown paper bags, and he believed that both were cold when found at the scene. Det. Bush was asked whether at any point in time he had investigated the victim’s involvement in a burglary the day he was killed. The detective stated |athat he was not directly involved in the investigation of that burglary, but that after the case was submitted for prosecution he became aware of that allegation.
Dr. Paul McGary, a forensic pathologist with the Orleans Parish Coroner’s Office, testified that he performed the autopsy and recovered four bullets from the victim who sustained six gunshot wounds. Two wounds to the face were inflicted at close range, within two to two and half feet from the muzzle of the gun, and four wounds were to the torso. Dr. McGary testified that Wound “E,” where the bullet went through the right and left ventricles of the victim’s heart and the aorta, was clearly fatal and that Wound “F,” which went through the right lung and made a hole in the aorta, would have been fatal if untreated. Dr. McGary said those two wound tracks went upward through the body and that the respective bullets that made those wounds were most likely fired from below the victim’s left foot while he was lying on his back.
Ms. Lazard testified that Lashaun was her boyfriend and that they lived with his mother, Gloria Butler, in her house on Cadiz Street. On the day of the killing, she and Lashaun had been sitting outside on the porch, when Lashaun went inside. Shortly thereafter, defendant arrived in a car, carrying two beers in brown paper bags. She called out to Lashaun, and he came outside: According to Ms. Lazard, defendant exited the car and gave Lashaun an Olde English beer, and they were all talking friendly. Suddenly, the defendant, who was still face-to-face with Lashaun, pulled a gun out from the back of his pants and immediately started shooting. Ms. Lazard testified that she immediately tried to get out of the way and did not see where Lashaun was hit or where he fell. She then ran into the house and told Ms. Butler that defendant had just killed La-shaun. Defendant also entered the residence and told Ms. Butler, “Tee, I just killed your son.” Ms. Butler grabbed 14defendant and shook him, saying, “No, you didn’t. You didn’t kill my baby.” Ms. Lazard left the residence and went to the neighbor’s side of the front porch, whereupon defendant exited the residence and shot Lashaun again. Defendant then pointed the gun toward Ms. Lazard, but she looked toward an approaching SUV and told defendant it was the police. Defendant said he did not care, lowered his gun, walked to his car and drove away. She told police that she witnessed “Birdie” shoot Lashaun, and later identified a photo of defendant as Birdie.
Ms. Lazard testified on cross examination that prior to defendant arriving at the residence he and Lashaun had talked on the telephone, because Lashaun told her that defendant was on his way over.
Ms. Butler testified that her son La-shaun and defendant had known each other for quite a few years; that they had come up in the same neighborhood; and that defendant, who called her “Tee,” was just like a child to her. She testified that at the time of the incident she was in the kitchen cooking and talking on the telephone with a friend, when she heard some popping sounds. Ms. Lazard then came *670 running in, saying that defendant had just shot and killed Lashaun. Defendant then entered the residence, holding a gun in his hand, and she confronted him. Defendant admitted killing Lashaun, but did not answer when she asked him why. She heard two more shots after defendant exited the residence. When she got outside she saw Lashaun lying dead on the porch, and defendant in the middle of the street. Ms. Butler identified defendant in court as the person she saw that day in her home with a gun.
During trial, the court granted the State’s motion in limine, barring the introduction by defendant of evidence that four hours before the victim was killed, he allegedly broke into the defendant’s residence in Jefferson Parish and stole a|sgun that belonged to defendant’s roommate, Elliot Ferran. Ashley Walker, defendant’s girlfriend, was allegedly inside the residence when the victim committed the burglary. A report of the alleged burglary was made to the Jefferson Parish Sheriffs Office that same day. The trial court ruled that the evidence would be inadmissible evidence of the character of the victim. However, the court permitted defendant to proffer the evidence, which he did, through the testimony of himself and five other witnesses. Defendant also testified before the jury.
Defendant testified before the jury that he was twenty-seven years old and worked as a pharmacist technician at Wal-Mart. He said he and Lashaun were like family, and had known each other for years. On the day of the shooting, he spoke to La-shaun a few times, the first time being around 10:30 or 11:00 a.m. The second time he spoke to Lashaun he, defendant, was at home, and he called Lashaun for family support. Lashaun invited him over. Defendant confirmed that he went to the Cadiz Street residence, wearing his handgun on his hip in a right-side holster. He had stopped at a store on the way to get two beers, and when he arrived, Ms. La-zard was outside on the porch. She called out for Lashaun, who was inside, telling him defendant was there.
When Lashaun came outside defendant handed him a beer, which Lashaun put down, as he already was drinking one. Lashaun shook defendant’s hand, gave him a hug, and asked him where “Ash” was, meaning Ms. Walker, defendant’s fiancée. Defendant replied that he had sent Ash to her uncle’s. Lashaun then asked defendant what was up. Defendant testified that he told Lashaun that somebody had broken into his home while he was at work. Lashaun asked defendant how he felt about that. Defendant replied, “How do you think I feel |fiabout it?” Defendant testified that Lashaun then said to him, “So, what you want [sic] do about it?” Defendant replied by stating something to the effect of “What would you do?” La-shaun then asked defendant if he was “strapped,” meaning armed, and when defendant replied in the affirmative, he said Lashaun pointed with his hand and asked to see the gun. Defendant said he lifted his shirt to display his handgun to La-shaun, and he said that Lashaun reached out to take the gun out of its holster. Defendant said he backed up but hit a wall, with nowhere else to go, and that Lashaun grabbed him. Defendant said he just so happened to get his gun out of the holster first and fired his first shot. He said he may have fired two shots, he was not sure.
Defendant testified that he was only five feet six inches tall, weighing one hundred twenty-seven pounds, and that Lashaun was a big guy. He said Lashaun was standing over him looking down at him, sort of leaning forward with his chest out and, although Lashaun did not move, de *671 fendant said he continued to fee until La-shaun hit the ground. He said that after the first two shots he heard a scream and saw someone run past him inside. After Lashaun was down, defendant went inside because he did not know who had just run past him inside. Inside, Lashaun’s mother said, “Birdie, no you didn’t.” He told her that it was not him, that it was not his fault, but that Lashaun had done it. Defendant explained that Lashaun had done it because Lashaun had reached for his gun and made defendant defend himself. He stated that Lashaun posed a threat to him, and that he did not pose a threat to Lashaun. Defendant replied in the affirmative when asked whether he knew La-shaun to be dangerous.
Defendant said on cross examination that he went to Lashaun’s residence between 5:80 and 6:15 p.m. the evening of the shooting. He began firing at |7Lashaun while Lashaun was holding his, defendant’s, wrist. When defendant was asked about shooting Lashaun twice more after he, defendant, had gone inside of the residence and come out, defendant replied, “In complete honesty, I don’t remember shooting him again.” When the prosecutor asked defendant if he felt threatened after Lashaun had been shot four times lying on the ground, defendant replied, “Not by him.”
NOPD Officer Warren Walker testified on proffer that Ms. Walker was his niece. She called him one day to tell her that someone had broken into the Terrytown or Gretna home of her fiancé, the defendant, and asked him to come to the residence. He said that when he went to the residence the front door was damaged. Ms. Walker, defendant’s grandparents and father, and a Jefferson Parish Sheriffs Office deputy were outside. Officer Walker said Ms. Walker was afraid and crying. While Officer Walker was in the residence, he observed defendant on the telephone. Defendant put the call on the speakerphone, and Officer Walker heard a male voice saying that he needed to talk to defendant.
Elliot Ferran testified on proffer that he and the defendant shared an apartment and that Ms. Walker would occasionally stay there. He testified that on the day of the shooting, he went to the movie with his fiancée and daughter between 10:00 a.m. to 2:00 p.m., and at one point received a call from the defendant, who was at work, telling him that someone had broken into their apartment. Ferran went to the apartment to find that the front door had been kicked in, his bedroom had been rifled, and a Ruger P89 9mm handgun had been removed from his closet.
Ms. Walker testified on proffer that she had met Lashaun on several occasions. On June 25, 2009, she was at defendant’s apartment when he came | ahorne for lunch and left between 1:00 and 2:00 p.m. She fell asleep in the bedroom and was awakened by a loud noise coming from downstairs. She cracked open the bedroom door and observed two males walking toward Ferran’s room. Ms. Walker said she thought she recognized one from the side. She closed the bedroom door, locked it, and checked the top dresser drawer for a firearm, but it was not there. She grabbed her cellphone off the charger, ran into the closet, called defendant, and told him to please come home.
Ms. Walker said she heard defendant’s bedroom door jiggle, heard someone say that it was locked, and then heard the door being kicked in. A couple of seconds later Lashaun opened the closet door. Ms. Walker said she was standing at the time, and was face-to-face with the victim. She was wearing only a T-shirt. She said La-shaun’s immediate reaction was one of surprise. He asked what she was doing *672 there. She said she just said his name, “Shaun.” She said she kept asking him what he was doing. He kept asking for defendant’s gun, looking in the closet, asking, “Where’s the gun? Where’s the gun?” Ms. Walker said she told Lashaun that she did not know where it was. She said Lashaun got upset and was kind of pacing. She said he said, “This nigga going to make me hurt him.” Ms. Walker said Lashaun then snapped, looked at her, and said, “Don’t tell Burt that it was me. If he asks, tell him some niggas came in here and you didn’t see them.” Lashaun grabbed the bottom of her face and threatened that if she did tell, it would cost her her life. She told Lashaun that she had already called defendant, but that she had not known it was him. She said Lashaun then kind of paced for a second before saying, “We got to go,” before turning around and running out.
Ms. Walker said that after Lashaun and the other individual left she went into the kitchen and peeked through the blinds, then got back in the closet and sat 19on the floor until defendant came. Defendant arrived. Ms. Walker said that before she told defendant that Lashaun was the person who had broken in, defendant telephoned Lashaun, told him about the break-in, and told him he did not want to be alone. Then defendant called the police. Defendant was in the process of making a third call when Ms. Walker told him that she had to tell him something. She then said, “It was Shaun.” She said defendant asked, “My cousin Shaun?,” and she replied in the affirmative. She testified that defendant fell back on the sofa and put his head in his hands. The police came, and so did her uncle, NOPD Officer Warren Walker. Ms. Walker replied in the affirmative when asked whether she had told defendant what Lashaun had told her. She said she told defendant everything that had happened.
On cross examination, Ms. Walker was shown a copy of her handwritten statement recounting the incident and was asked whether she saw anything in there that the perpetrator said he was going to do anything to defendant. Ms. Walker confirmed that there was nothing in her statement about that. Ms. Walker replied in the negative when asked whether La-shaun had a gun or ever pointed a gun at her. She assumed that she told defendant that she did not see Lashaun with a gun, although she did not remember ever conversing about a gun. On redirect examination, Ms. Walker confirmed that she did not call police.
Christina Carr testified on proffer that she had known Lashaun and they had friends in common, including defendant. She said Lashaun’s reputation pre-Hurri-cane Katrina was that of a gangster, although she had never personally witnessed him shoot or rob anyone. According to her, she and Lashaun used to go drinking together, and that she was present when he fist-fought people. She had | inalso witnessed defendant engage in a fistfight, but did not consider him to be a violent person.
Harold Payne testified on proffer that he had known Lashaun for approximately ten years and first met him through defendant. He testified that he also knew La-shaun’s mother, sister, and two brothers, one of whom was Lashaun’s twin. According to Payne, Lashaun’s twin brother’s nickname was “Mayhem,” while Lashaun’s was “Chaos.” Payne admitted on cross examination that he had never witnessed Lashaun engage in violent behavior.
Defendant testified on proffer that he left his apartment the morning of June 25, 2009, and went straight to work. When he arrived, he discovered he was not scheduled to work until noon. He decided to run a few errands and returned home *673 around 10:80 or 11:00 a.m. He later went to work and received a call from Ms. Walker, who was whispering, telling to him to hurry up and come home. He asked her what was wrong, and she just kept asking him to come home, before the phone was hung up. Defendant said he paused for a minute, and “it occurred to me. Okay. My house is being broken into.”
Defendant went directly home, parked his car, removed his handgun from underneath his car seat, and entered his residence. His front doorframe was split; one of the hinges was broken off; and the doorframe strike plate was sitting on the steps. He carefully entered his residence, gun in hand, and quietly proceeded upstairs, whereupon he called out Ms. Walker’s name twice before she answered from his bedroom. The bedroom door had been kicked in, and he found Ms. Walker in the closet, balled up on the floor crying. Defendant called the police. Defendant then went to check the rest of the apartment. While waiting for police he telephoned his roommate and Lashaun. Ms. Walker did not tell him who had | ncommitted the burglary until after police had arrived. While waiting for the police, Ms. Walker told defendant she had to tell him something, but that she could not because she believed they (Lashaun and his accomplice) were going to kill her. She finally told defendant in front of police that Lashaun had burglarized the apartment.
Defendant gave police Lashaun’s name, but did not give them the Cadiz Street address of Lashaun’s mother. Defendant said he did not know whether Lashaun was still on Cadiz Street at the time, because defendant had been told earlier in the day that Lashaun was returning to Houston. Defendant’s entire telephone conversation with Lashaun that day, while NOPD Officer Walker was present, was on speakerphone. After that conversation with La-shaun, defendant sent Ms. Walker with her uncle for her protection, and then he left to go to Lashaun’s mother’s residence. Defendant stopped at a store on his way to Cadiz Street. Defendant replied in the affirmative when asked whether he believed Lashaun Butler was dangerous. He had seen Lashaun fight with a police officer in 2001. Defendant replied in the affirmative when asked whether he had ever seen Lashaun with a gun. Asked how frequently he saw Lashaun with a gun, defendant replied, “[a]s often as he could get one.” He said the last time he had seen Lashaun with a gun was perhaps in 2003 or 2004, when the two went to a gas station to get a beer, and Lashaun stuck a shotgun in his jeans.
On cross examination, defendant said he went to Lashaun’s residence because he wanted to know why Lashaun would do what he did. Defendant admitted he told police who had broken into his apartment. Defendant admitted that he gave police a Rocheblave Street address for Lashaun, and that as soon as they left he went to Cadiz Street. When asked whether he wanted the police to find |12Lashaun and bring him to justice, defendant replied, “I did, but I didn’t. I mean, this man is my cousin. I’m going to send him to jail?” Speaking about the confrontation with La-shaun, defendant maintained that he knew Lashaun had a gun because Lashaun had stolen defendant’s roommate’s gun. When asked how he knew the other perpetrator of the burglary did not have the gun, defendant explained that it would not make any sense for Lashaun to break into his apartment with someone he did not know, and then give that person the gun.
The prosecutor questioned defendant about his job as a pharmacy technician, about how it requires patience, and then asked defendant how he lost his patience and shot Lashaun, defendant replied, *674 “Who says I lost it? I never said I lost it. You did.” The prosecutor then asked, “Okay. So when you went over there, you weren’t acting in the heat of passion?,” to which defendant replied, “No, I wasn’t.” When later asked, “And you weren’t acting under the heat of passion? You were calm and you were just going to talk, right?,” defendant replied, “Right.” He was later asked if he felt any emotion, and he replied that he was feeling a lot of emotions during the day. He was then asked, “But you weren’t acting based on those emotions. You were acting rationally, right?” Defendant replied, “I was trying my best. Yes.”
When the prosecutor then asked: “And you drove over there, and you stopped and got a beer, and you just want to talk?,” defendant replied, “I mean we’re family. I mean, why couldn’t we? Me and my younger brother have disagreements all the time. And we do the same thing. Well, look, dude. Let’s just talk about it. As a matter of fact, we just had a disagreement.” Defendant downplayed that he was carrying a gun when he went to Cadiz Street, implying that it was not out of the ordinary for him to go over there with a beer and a gun, Instating, “It wouldn’t be any other day that I went over there with a beer and without a gun.”
ERRORS PATENT
A review of the record reveals no errors patent on the face of the record.
ASSIGNMENT OF ERROR NO. 1
In his first assignment of error defendant argues that the trial court erred in granting the State’s motion in limine and thus excluding evidence of the victim, La-shaun Butler’s, prior bad acts and his character. Specifically, the State sought to bar evidence pertaining to the burglary of defendant’s apartment by the victim, on the same day, and only hours before, defendant shot and killed him. A handgun belonging to defendant’s roommate was reportedly stolen in the burglary, and defendant’s fiancée, Ms. Walker, who was in the apartment alone at the time, was threatened by the victim with death if she revealed his identity as the perpetrator. In addition, during the burglary, when the victim could not find a handgun belonging to defendant in the apartment, the victim threatened that defendant was going to make him hurt defendant.
All this was the subject of the proffered testimony of defendant; Ms. Walker; her uncle, NOPD Officer Walker; Mr. Ferran, defendant’s roommate; and Ms. Carr and Mr. Payne, two individuals who supposedly knew of Lashaun’s character.
Defendant argues that the evidence went to his state of mind, given that a conviction for second degree murder requires proof of specific intent to kill or to inflict great bodily harm, and that one of the responsive verdicts is manslaughter. Defendant further argues that the evidence was relevant to the issue of self-defense 114and the defense of others, given that Lashaun had threatened to kill Ms. Walker and that, according to defendant, immediately prior to the shooting Lashaun leaned forward and reached out his hand to take defendant’s gun out of its holster. Defendant said he backed up into a wall and only began firing at Lashaun while Lashaun was holding his, defendant’s, wrist. Defendant testified that he believed that if he had not shot defendant he would not have been “here” today, obviously meaning he would not be alive.
The Louisiana Supreme Court said, in State v. Van Winkle, 94-0947, p. 5 (La.6/30/95), 658 So.2d 198, 201-202:
A criminal defendant has the constitutional right to present a defense. U.S. Const. Amend. VI; La. Const. Art. 1 § 16; Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); *675 State v. Gremillion, 542 So.2d 1074 (La.1989); State v. Vigee, 518 So.2d 501 (La.1988). Due process affords a defendant the right of full confrontation and cross examination of the State’s witnesses. Chambers v. Mississippi, 410 U.S. 284, 98 S.Ct. 1038, 35 L.Ed.2d 297 (1973); State v. Mosby, 595 So.2d 1135 (La.1992). It is difficult to imagine rights more inextricably linked to our concept of a fair trial.
Evidentiary rules may not supersede the fundamental right to present a defense. State v. Sartain, 2008-0266, p. 16 (La.App. 4 Cir. 12/30/08), 2 So.3d 1132, 1141. However, all evidence presented must be relevant. See Van Winkle, supra (“[NJormally inadmissible hearsay may be admitted if it is reliable, trustworthy and relevant, and if to exclude it would compromise the defendant’s right to present a defense. See Chambers v. Mississippi, 410 U.S. at 302, 93 S.Ct. at 1049.”).
In the instant case, defendant submits that evidence of the victim’s bad character or his threats supported a plea of self-defense, and that the evidence was | ^admissible under La. C.E. art. 404(A)(2)(a). La. C.E. art. 404 states, in pertinent part:
A. Character evidence generally. Evidence of a person’s character or a trait of his character, such as a moral quality, is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:
[[Image here]]
(2) Character of victim, (a) Except as provided in Article 412,[1] evidence of a pertinent trait of character, such as a moral quality, of the victim of the crime offered by an accused, or by the prosé-cution to rebut the character evidence; provided that in the absence of evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, evidence of his dangerous character is not admissible;
Instate v. Williams, 96-1587, pp. 7-8 (La.App. 4 Cir. 4/16/97), 693 So.2d 249, 253-254, this court discussed the use of character evidence with respect to the victim of a crime:
When a defendant pleads self-defense, evidence of the victim’s dangerous character or of threats against the defendant is relevant to show the victim was the aggressor and that the defendant’s fear of danger was reasonable. State v. Edwards, 420 So.2d 663, 669 (La.1982); State v. Montz, 92-2073 (La.App. 4th Cir.2/11/94), 632 So.2d 822, 824-825, writ denied, 94-0605 (La.6/3/94), 637 So.2d 499.
For such evidence to be admissible, the defendant must first produce evidence that at the time of the incident the victim made a hostile demonstration or committed an overt act against him of such character that would have created in the mind of a reasonable person the fear that he was in the immediate danger of losing his life or suffering great bodily harm. State v. Gantt, 616 So.2d 1300, 1304 (La.App. 2nd Cir.1993), writ denied, 623 So.2d 1302 (La.1993). An overt act is any act which manifests to the mind of a reasonable person a present intention to kill or inflict great bodily harm. Edwards, supra at 669.
Once evidence of an overt act is established, evidence of the victim’s threats to *676 ' the defendant and of the victim’s 11fidangerous character are admissible: (1) to show the defendant’s reasonable apprehension of danger justifying his conduct and (2) to help determine who was the aggressor. Edwards, supra at 670.
If the purpose is to show the defendant’s reasonable apprehension of danger, it must be shown that the defendant knew of the victim’s prior threats or reputation. Edwards, supra, at 670; State v. Eishtadt, 531 So.2d 1133, 1135 (La.App. 4th Cir.1988). Once this knowledge is established, evidence of the victim’s character, both general reputation and specific threats or acts of violence against the defendant are admissible. Edwards, supra, at 670.
If the purpose is to show that the victim was the aggressor, there is no requirement that the defendant know of the victim’s prior acts or reputation. Eishtadt, supra at 1135.
This court commented on the evidence necessary to meet the threshold requirement of La. C.E. art. 404(A) in State v. James, 95-1182, p. 4 (La.App. 4 Cir. 6/5/96), 675 So.2d 1224, 1227, as follows:
The evidence tending to establish an overt act must be “appreciable.” State v. Lee, 331 So.2d 455, 459 (La.1975), original opinion reinstated on reh’g (La. 1976). When appreciable evidence of the overt act is in the record, the trial court cannot infringe on the fact-finding function of the jury by disbelieving the defense testimony and thereby deny the accused a defense permitted him by law. Id. at 459.
A defendant’s unsupported, self-serving testimony which is sufficiently contradicted by other evidence does not constitute “appreciable evidence” of an overt act or hostile demonstration on the part of the victim. See State v. Carter, 490 So.2d 291, 294 (La.App. 4th Cir.1986); State v. Hardeman, 467 So.2d 1163, 1171 (La.App. 2d Cir.1985).
La. R.S. 14:20 sets forth the circumstances in which a homicide is considered justifiable. In particular, La. R.S. 14:20(A)(1) provides that a homicide is justifiable “[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.” Under La. R.S. |1714:22, “it is justifiable to use force or violence or to kill in the defense of another person when it is reasonably apparent that the person attacked could have justifiably used such means himself, and when it is reasonably believed that such intervention is necessary to protect the other person.”
In the instant case, the only evidence of an overt act by the victim — other than the burglary itself and the victim’s actions during the burglary — was defendant’s testimony that while he was conversing with the victim the victim asked to see defendant’s gun, and when defendant lifted his shirt to display his holstered gun, defendant claimed the victim leaned forward and reached out for his gun. Defendant also claimed he did not start shooting until he was backed into a wall by the victim and the victim had him by the wrist. However, the victim’s girlfriend, Ms. La-zard, replied in the negative when asked whether she ever saw Lashaun reach for defendant’s person and try to take anything off his person.
On the issue of a hostile demonstration or overt act by the victim, defendant’s self-serving testimony that Lashaun reached out as if to take his gun, backed him against a wall, and when he began shooting at Lashaun, Lashaun had him by the wrist, is contradicted by the testimony of Ms. Lazard, who was approximately six *677 feet from the two men when defendant started shootmg. She did not see Lashaun reach out toward defendant, but witnessed defendant pull the gun from behind his back and immediately start shooting. Thus, defendant’s self-serving testimony was sufficiently contradicted by other evidence. Consequently, that self-serving testimony did not constitute “appreciable evidence” of a hostile demonstration or an overt act by the victim.
Accordingly, the trial court did not err in finding that the proffered evidence relative to the burglary, Lashaun’s threats made towards defendant’s girlfriend |! ¡¡during the burglary, and/or Lashaun’s general reputation, was not admissible under La. C.E. art. 404(A) insofar as the issue of self-defense.
Moreover, the evidence established that after initially shootmg the victim four times, twice in the face and twice in the torso, and entering the Lashaun’s mother’s residence, defendant exited, walked down the steps of the front porch, and fired two more bullets into the victim as he was lying on his back on the porch. Those final two bullets resulted in the two fatal wounds — Dr. McGary testified that the other four bullet wounds were survivable. Lashaun presented no danger at all to defendant when those two fatal bullets were fired; there was no evidence of any activity at all by Lashaun Butler at that time. Thus, any evidence of a hostile demonstration or an overt act by Lashaun prior to defendant shooting him the first four times was irrelevant, and thus inadmissible, to the issue of defendant acting in self-defense. Thus, the trial court would have properly denied admission of the evidence on the ground that it was irrelevant.
In addition, the proffered evidence was not admissible for purposes of establishing that defendant justifiably shot and killed Lashaun in defense of his girlfriend. Ms. Walker had been taken from the scene of the burglary hours earlier by her uncle and was not present at the Butler residence when defendant shot and killed La-shaun.
Defendant’s second argument is that the proffered evidence of the burglary, La-shaun’s threats upon Ms. Walker, and/or Lashaun’s reputation, was relevant to the responsive verdict of manslaughter. Manslaughter is defined in pertinent part by La. R.S. 14:31 as:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat 119of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender’s blood had actually cooled, or that an average person’s blood would have cooled, at the time the offense was committed; ....
The Louisiana Supreme Court explained the relationship between the two separate offenses of homicide and manslaughter in State v. Snyder, 98-1078, p. 4 (La.4/14/99), 750 So.2d 832, 837-838, as follows:
It is the presence of “sudden passion” and “heat of blood” that distinguishes manslaughter from murder. This court has repeatedly stated, however, that “sudden passion” and “heat of blood” are not elements of the offense of manslaughter. Rather, they are mitigatory factors in the nature of a defense which exhibit a degree of culpability less than that present when the homicide is committed in the absence of these factors. State v. Lombard, 486 So.2d 106 (La.1986); State v. Tompkins, 403 So.2d 644 (La.1981). Because they are mitigatory *678 factors, a defendant who establishes by a preponderance of the evidence that he acted in “sudden passion” or “heat of blood” is entitled to a verdict of manslaughter. Lombard, 486 So.2d at 111.
“Heat of blood” or “sudden passion” is defined in the case law as provocation sufficient to deprive an average person of his self-control and cool reflection. State v. Robinson, 2001-1305, p. 11 (La.App. 4 Cir. 4/17/02), 820 So.2d 571, 579. However, such provocation shall not reduce a homicide to manslaughter if the jury finds that the offender’s blood had actually cooled or that an average person’s blood would have cooled at the time the offense was committed. State v. Collor, 99-0175, p. 10 (La.App. 4 Cir. 4/26/00), 762 So.2d 96, 102.
There is no merit to defendant’s argument that the trial court erred in barring the evidence because it was admissible as relevant to a responsive verdict of manslaughter. First, when the prosecutor asked defendant during his testimony on Lnproffer about losing his patience and shooting Lashaun, defendant replied, “Who says I lost it? I never said I lost it. You did.” When the prosecutor asked, “Okay. So when you went over there, you weren’t acting in the heat of passion?,” to which defendant replied, “No, I wasn’t.” When later asked, “And you weren’t acting under the heat of passion? You were calm and you were just going to talk, right?,” defendant replied, “Right.”
Defendant did allude to some emotional distress when later asked by the prosecutor if he had felt any emotion, whereupon defendant replied that he was feeling a lot of emotions during the day. He was then asked, “But you weren’t acting based on those emotions. You were acting rationally, right?” Defendant replied, “I was trying my best. Yes.” However, when the prosecutor then asked: “And you drove over there, and you stopped and got a beer, and you just want to talk?,” defendant replied:
I mean we’re family. I mean, why couldn’t we? Me and my younger brother have disagreements all the time. And we do the same thing. Well, look, dude. Let’s just talk about it. As a matter of fact, we just had a disagreement.
In his appellate brief defendant concedes that the aggravated burglary occurred at 1:32 p.m.; that he arrived at his residence at some point thereafter; and that the shooting was reported to 911 at 5:58 p.m. on that same date. Defendant speculates that the “attenuation” time between the burglary, or when he learned Lashaun had committed the burglary, was “roughly” three hours.
Defendant argues that the trial court erred in finding that the burglary evidence was too attenuated to be admissible. However, defendant fails to cite any jurisprudence wherein a defendant established by a preponderance of the evidence that he killed an individual in “sudden passion” or “heat of blood” wherein the |¾1 defendant learned of the precipitating act by the victim three hours prior to the killing.
The overwhelming evidence, from defendant’s own testimony as well as that of the Ms. Lazard was that defendant was calm from the time he arrived at the Cadiz Street residence until the time he pulled a gun from his holster and shot the victim four times. Defendant had even stopped on his way to Cadiz Street from his West-bank residence to purchase a beer for himself and a beer for defendant.
The trial court essentially found that the proffered evidence was irrelevant to the issue of manslaughter, and/or that, under *679 La. C.E. art. 403[2], even if minimally relevant, the probative value of such evidence was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time, and thus excluded it.[3]
Unfair prejudice as used in La. C.E. art. 403 means that in the context the offered evidence has “an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.” State v. Brooks, 98-0693, p. 16 (La.App. 4 Cir. 7/21/99), 758 So.2d 814, 823, quoting 1997 Authors’ Notes to La. C.E. art. 403. A trial court’s ruling as to relevancy will not be disturbed absent a clear abuse of discretion. State v. White, 2009-0025, p. 9 (La.App. 4 Cir. 9/16/09), 22 So.3d 197, 204. A trial court is vested with much discretion in | ^determining whether the probative value of relevant evidence is substantially outweighed by its prejudicial effect. White, supra.
We cannot say the trial court erred in finding the proffered evidence was either irrelevant, insofar as the issue of manslaughter, or that even if minimally relevant, its probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.
This assignment of error is without merit.
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.
ASSIGNMENT OF ERROR NO. 2
In this assignment of error defendant claims that the trial court erred in denying his motion for new trial, as the verdict was contrary to the law and evidence. An assignment of error as to the denial of a motion for new trial alleging the verdict is contrary to the law and the evidence presents nothing for appellate review because an appellate court may not review facts in a criminal case. See State v. Guillory, 2010-1231, p. 3 (La.App. 4 Cir. 10/8/10), 45 So.3d 612, 614-615 (“A motion for a new trial challenging the sufficiency of the evidence is a question of fact outside of the higher courts’ constitutional scope of review.”).
In arguing this assignment of error, defendant claims that the evidence was insufficient to sustain his conviction because the State failed to prove beyond a reasonable doubt that defendant did not kill Lashaun in self-defense or in defense of Ms. Walker. This argument is without merit.
This court set forth the applicable standard of review for sufficiency of the evidence in State v. Huckaby, 2000-1082, p. 32, 809 So.2d 1093, 1111, as follows:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must | ^determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 *680 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1805 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. The fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall; Green, supra. “[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.” State v. Smith, 600 So.2d 1319 (La.1992) at 1324.
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circum-
stantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
Id., quoting State v. Ragas, 98-0011, pp. 13-14 (La.App. 4 Cir. 7/28/99), 744 So.2d 99, 106-107.
Viewing all the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that defendant did not kill Lashaun because he reasonably believed that he was in imminent danger of losing his life or receiving great bodily harm and that the killing was necessary to | ¾4save himself from that danger. Further viewing all the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that defendant was not justified in killing Lashaun in defense of Ms. Walker, when she was not at the Cadiz Street address when the shooting occurred.
There is no merit to this assignment of error.
ASSIGNMENT OF ERROR NO. 3
In this assignment of error defendant argues that his conviction with a non-unanimous verdict, as provided for by La. C.Cr.P. art. 782(A),[4] is unconstitutional.
The record does not reflect that defendant objected to the standard jury instruction that presumably was given by the trial court that at least ten of twelve jurors had to concur to render a verdict, as per La.C.Cr.P. art. 782(A). Nor does the record reflect that defendant filed a motion to declare La.C.Cr.P. art. 782(A) unconstitutional. Thus, defendant *681 may not complain of this issue on appeal. State v. Rubens, 2010-1114, pp. 28-30 (La.App. 4 Cir. 11/30/11), 83 So.3d 30, 49-50. Even assuming arguendo that defendant had preserved this issue for review, as correctly conceded by defendant’s appellate counsel, the Louisiana Supreme Court has upheld La.C.Cr.P. art. 782 and Louisiana’s the non-unanimous verdict system. See State v. Bertrand, 2008-2215 (La.3/17/09), 6 So.3d 738.
lajThere is no merit to this assignment of error.
ASSIGNMENT OF ERROR NO. 4
In this assignment of error, defendant argues that the trial court erred in admitting a 911 recording. In a pretrial motion in limine, the State had argued that the 911 call was (1) probative evidence admissible under several hearsay exceptions pursuant to La. C.E. art. 801 et seq.; and (2) it did not violate defendant’s rights under the Sixth Amendment’s Confrontation Clause because it was “nontestimonial” under Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), and its progeny, Davis v. Washington, 547 U.S. 813, 126 S.Ct. 2266, 165 L.E.2d 224 (2006).
On the first day of trial, prior to the first witness being sworn, the motion was argued. At that time, defense counsel argued only that the 911 call was “testimonial,” and thus that defendant’s confrontation rights would be violated by its admission. The trial court disagreed, finding that it was nontestimonial in nature, noting that the caller did not identify defendant at all or describe any physical characteristics of the shooter; that the 911 call merely evidenced the fact that there had been a shooting; and that it set a predicate for the State to develop its theory of police response in the case.
On appeal, the defendant argues that the 911 recording, and transcript thereof, constituted inadmissible hearsay evidence which was irrelevant and/or, if relevant, that its probative value was substantially outweighed by its prejudicial effect. However, defendant did not raise a hearsay objection as to the 911 call or argue that the probative value of the call was substantially outweighed by its prejudicial effect when challenging the State’s motion in limine. Given that ^defendant failed to raise these issues in the trial court, he failed to preserve them for review on appeal. See La.C.Cr.P. art. 841 (“An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence.”). Nonetheless, he did argue the testimonial versus nontestimonial Crawford issue in the trial court.
Neither the 911 tape nor the transcript is contained in the record on appeal.[5] However, in its motion in limine the State represented that the 911 call was from a female identified as “Shelly,” who reported that she heard five gunshots, and then heard someone say: “Bitch!,” followed by the sound of another gunshot. Shelly could not provide a description of the shooter other than “black male.” The State further represented that Shelly told the dispatcher, “I got away from the window because I don’t want to get shot,” and when asked about the details of the shooter’s whereabouts, said “I’m not going outside.” [6]
*682 Insofar as defendant raises the Crawford issue on appeal, that he was deprived of his Sixth Amendment right to confront the witnesses against him by the admission of the 911 call, for the following reasons it is clear that the trial court correctly found that the 911 caller’s statements were nontestimonial in nature, and thus did not violate of defendant’s right to confrontation.
In Crawford, the U.S. Supreme Court held that the admission of “testimonial” hearsay evidence violates the Sixth Amendment’s Confrontation Clause. The hearsay the Court found testimonial was a recorded statement given | OTby the defendant’s wife to police after she had been advised of her Miranda[7] rights. The statement was introduced by the State to rebut the defendant’s claim of self-defense in a stabbing case in which he was charged with assault and attempted murder. Defendant and his wife were each interrogated twice by police. The wife did not testify because of the state marital privilege, and the defendant had no other opportunity to cross examine her. The Court in Crawford left “for another day any effort to spell out a comprehensive definition of ‘testimonial,’ ” but stated that “[w]hatever else the term covers, it applies at a minimum to ... police interrogations.” 541 U.S. at 68,124 S.Ct. at 1374.
In Davis, the U.S. Supreme Court had to determine whether a recording of a 911 call from a victim of domestic violence was testimonial within the meaning of Crawford. The 911 operator first asked the caller what was going on, to which the caller responded that “he [sic] here jum-pin’ on me again.” 547 U.S. at 817, 126 S.Ct. at 2271. The 911 operator asked if there were any weapons, and the caller said “No. He’s [sic] usin’ his fists.” The 911 operator asked the caller, in three successive questions, if she knew, first, the perpetrator’s last name, second, his first name, and third, his middle initial. In response to each respective question the caller gave the operator the defendant’s last, first, and full middle names. The defendant was charged with, and convicted of, a felony violation of a domestic no-contact order.
The issue in Davis was whether, “objectively considered, the interrogation that took place in the course of the 911 call produced testimonial statements” as contemplated by Crawford. Davis, 547 U.S. at 826, 126 S.Ct. at 2276. In its analysis, the Court noted that when it had stated in Cranford that interrogations by law enforcement fall squarely within the class of testimonial hearsay with which the Sixth Amendment was concerned, the Court “had immediately in mind (for that was the case before us) interrogations solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator. The product of such interrogation ... is testimonial.” Davis, 547 U.S. at 826, 126 S.Ct. at 2276.
The Davis Court noted that the domestic violence victim who called 911 in that case was speaking about events as they were actually happening, rather than describing past events, while the interrogation of the defendant’s wife in Crawford took place hours after the events she described had occurred. Moreover, the Court noted, any reasonable listener would recognize that the domestic abuse victim in Davis was facing an ongoing emergency and that her call was plainly a call for help against a bona fide physical threat. The Court stressed that the nature of the questions asked by the 911 operator in Davis, “viewed objectively, was such that the elic *683 ited statements were necessary to be able to resolve the present emergency, rather than simply to learn (as in Crawford) what had happened in the past. (Emphasis in original).” Davis, 547 U.S. at 827, 126 S.Ct. at 2276. The Court said this was true even of the 911 operator’s effort to establish the identity of the assailant, so that dispatched officers might know whether they would be encountering a violent felon.
The Court in Davis concluded that the circumstances of the 911 caller’s interrogation objectively indicated that the primary purpose of the operator’s interrogation was to enable police assistance to meet an ongoing emergency. “She simply was not acting as a witness; she was not testifying. ... No ‘witness’ goes 129into court to proclaim an emergency and seek help.” (emphasis in original), Davis, 547 U.S. at 828,126 S.Ct. at 2277.
In this case, while the 911 caller was not the crime victim reporting the crime, she nevertheless was reporting multiple gunshots close to her home. The evidence indicates that the 911 call was made shortly after the shots were fired, given that the caller was afraid to peer out of her window to get a better description of the shooter for fear of being shot. Similarly, when asked by the 911 operator of the shooter’s whereabouts, the caller replied that she was not going outside to see where he went. The purpose of the 911 call by “Shelly” was to meet an ongoing emergency involving multiple gunshots near her home, not to give police specific information so they could track down and apprehend the suspect.
Any claim that the information given by the 911 caller in this case was testimonial in nature, and thus violative of defendant’s Sixth Amendment right is without merit.
This assignment of error is without merit.
DECREE
Accordingly, for the foregoing reasons, the defendant’s conviction and sentence are affirmed.
AFFIRMED

. La. C.E. art. 412 concerns evidence of a victim's sexual behavior in sexual assault cases and is not applicable in the instant case.

. La. C.E. art. 403 states:

. At the conclusion of the proffered defense testimony, the trial court noted for the record that defendant misled police as to where Butler could be found, so defendant could get to him first. However, the trial court expressly stated that it was not changing its ruling, apparently meaning the reasons for disallowing the testimony.

. La.C.Cr.P. art. 782(A) states:
A. Cases in which punishment may be capital shall be tried by a jury of twelve jurors, all of whom must concur to render a verdict. Cases in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict. Cases in which the punishment may be confinement at hard labor shall be tried by a jury composed of six jurors, all of whom must concur to render a verdict.

. Defendant does not complain on appeal about the absence from the record of the 911 recording or the transcript therefrom.

. Defendant’s trial counsel did not object to the State’s representation of the contents of the 911 call in its motion in limine, nor does his appellate counsel do so in this appeal.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).