# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 23-508

**STATE OF LOUISIANA**

**VERSUS**

**DEMYRON L. SKINNER**

**********

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 19-K-4765-D
HONORABLE D. JASON MECHE, DISTRICT JUDGE

**********

## LEDRICKA J. THIERRY
## JUDGE

**********

Court composed of Sharon Darville Wilson, Charles G. Fitzgerald, and Ledricka J. Thierry, Judges.

**AFFIRMED.**

**Edward K. Bauman**
**Louisiana Appellate Project**
**P.O. Box 1641**
**Lake Charles, LA 70602**
**(337) 491-0570**
**COUNSEL FOR DEFENDANT-APPELLANT:**
    **Demyron L. Skinner**

**Chad Pitre, District Attorney**
**Kathleen L. Ryan, Assistant District Attorney**
**St. Landry Parish**
**P.O. Drawer 1968**
**Opelousas, LA 70571**
**(337) 948-0551**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**THIERRY, Judge.**

Defendant, Demyron L. Skinner, appeals his conviction and sentence of thirty-five years at hard labor for manslaughter. For the following reasons, we affirm Defendant's conviction and sentence.

## FACTS AND PROCEDURAL HISTORY

On November 4, 2019, while riding in a vehicle with his girlfriend, Lainey Lomas, Defendant shot De'Omante Frank while he was sitting on his bicycle. Later that night, Frank died as a result of the gunshot wound.

Defendant was subsequently indicted on February 20, 2020, with second degree murder, a violation of La.R.S. 14:30.1. Jury selection commenced on April 12, 2023, and the jury found Defendant guilty of the responsive verdict of manslaughter, a violation of La.R.S. 14:31. Defendant was sentenced on April 27, 2023, to serve thirty-five years at hard labor. Defendant filed a motion for appeal, which was subsequently granted.

Defendant is before this court asserting three assignments of error: 1) the State failed to prove he did not reasonably believe he was in imminent danger when he shot the victim; 2) the trial court erred in not allowing evidence of prior hostile acts committed by the victim; and 3) trial counsel was ineffective in failing to file several motions and raise particular objections.

## ANALYSIS

*Assignment of Error No. 1*

In his first assignment of error, Defendant contends the evidence introduced at trial was insufficient to prove beyond a reasonable doubt that he did not reasonably believe he was in imminent danger when he shot the victim.

> In reviewing the sufficiency of evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution,

was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Captville*, 448 So.2d 676, 678 (La.1984).

*State v. Pigford*, 05-477, pp. 5–6 (La. 2/22/06), 922 So.2d 517, 520–21 (per curiam).

"[C]redibility assessments are within the province of the fact-finder, in this case the jury. A jury may 'accept or reject, in whole or in part,' any witness's testimony." *State v. Hypolite*, 04-1658, p. 5 (La.App. 3 Cir. 6/1/05), 903 So.2d 1275, 1279, *writ denied*, 06-618 (La. 9/22/06), 937 So.2d 381.

Defendant contends the homicide was justifiable because the shooting was committed in self-defense. Louisiana Revised Statutes 14:20 addresses justifiable homicide, in pertinent part:

A. A homicide is justifiable:

(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.

(2) When committed for the purpose of preventing a violent or forcible felony involving danger to life or of great bodily harm by one who reasonably believes that such an offense is about to be committed and that such action is necessary for its prevention. The circumstances must be sufficient to excite the fear of a reasonable person that there would be serious danger to his own life or person if he attempted to prevent the felony without the killing.

"[W]hen a defendant claims self-defense, the state has the burden of establishing beyond a reasonable doubt that he did not act in self-defense." *State v. Garcia*, 483 So.2d 953, 956 (La.1986).

"In examining a self-defense claim, it is necessary to consider: (1) whether the defendant reasonably believed that he was in imminent danger of death or great bodily harm; (2) whether the killing was necessary to prevent that death or great bodily harm; and (3) whether the defendant was the aggressor in the conflict." *State v. Mayes*, 14-683, pp. 2–3 (La.App. 3 Cir. 12/23/14), 154 So.3d 1257, 1259, *writs denied*, 15-178, 15-220 (La. 11/16/15), 184 So.3d 24. Additionally, in determining whether the defendant had a reasonable belief that the killing was necessary, it is appropriate to consider "the excitement and

2

confusion of the situation, the possibility of using force or violence short of killing, and the defendant's knowledge of the assailant's bad character." *State v. Thomas*, 43,100, p. 5 (La.App. 2 Cir. 4/30/08), 981 So.2d 850, 854, *writ denied*, 08-1276 (La. 2/6/09), 999 So.2d 769.

*State v. Fox*, 15-692, p. 4 (La.App. 3 Cir. 2/3/16), 184 So.3d 886, 890, *writ denied*, 16-404 (La. 3/13/17), 216 So.3d 800.

*Pertinent Evidence*

Lieutenant Ryan Young with the Eunice Police Department testified that on November 4, 2019, he was dispatched to the crime scene located at South Martin Luther King Drive and East Maple Avenue at approximately 11:50 a.m. There were several police officers, medical personnel, and lay persons present at the scene when he arrived. It was determined that De'Omante Frank was the victim, and his nickname was D-Gotti.

According to Lieutenant Young, a weapon was not removed from the victim prior to his transport to the hospital, and no one at the scene reported that a weapon was found on the victim's person. Police searched the area immediately surrounding the body, the area immediately south of the body, the roadway north of the body, and the grassy area east of the body. The search area was expanded on November 7, 2019, and six .40 caliber shell casings were located approximately forty to fifty yards from where the victim's body was found. Lieutenant Young was asked about a working theory based on the location and distance between the casings found by police and stated:

> It appears that the casings, where they were located, they were located almost in a straight line. And the distance between them indicates that they were fired in a rapid succession. And then they were fired while either the shooter was moving, or their vehicle, bicycle, . . .

On November 8, 2019, police received information from a confidential source, Darius Bazile, that Defendant might be responsible for the victim's death.

Bazile was the victim's best friend. Police were also informed that Defendant's girlfriend, Lainey Lomas, drove a four-door, black car.

Defendant was subsequently detained and questioned. Lomas was brought in on an active warrant in Acadia Parish. Lomas informed police:

> She stated that she was driving her mother's car on that day--- which is a black Honda Accord---and she had picked up her boyfriend, Mr. Demyron Skinner, and they were riding around and they had "saw" the victim Mr. Frank and Mr. Bazile walking by Raymond's Grocery Store. Some words were alleged to have been exchanged between the defendant and Mr. Frank. They then went to the defendant's mother's house where he is alleged to have gotten into an argument with his mother, and then they left. And as they were traveling east on East Maple Avenue that they saw Mr. Frank exiting the apartment complex on a bicycle, and another exchange was made. As they were driving, she stated that it appeared that Mr. Frank lifted his shirt, and she said that Mr. Demyron Skinner began firing shots out of the passenger window of the vehicle.

Lieutenant Young said there was a verbal disagreement near Raymond's Grocery.

Lieutenant Young was further questioned:

Q. And did Ms. Lainey Lomas tell you that, at some other point, Mr. Skinner and herself encountered Mr. De'Omante Frank again?

A. She said they were driving down East Maple Avenue and saw Mr. Frank as he was leaving the MLK apartment complex.

Q. Okay, did she tell you where they were headed?

A. No.

Q. Did she tell you whether or not Mr. Skinner advised her to take that route?

A. I don't think so.

Q. Okay. And at some point, she said that they encounter[ed] Mr. Frank.

A. Yes.

Q. And it is your testimony that she then told you that Mr. Skinner started firing from the vehicle?

4

A.     She stated that as they were passing him that Mr. Frank lifted his shirt, and Mr. Skinner began firing a handgun from her vehicle as they drove off.

Q.     Okay, but in your report, isn't it true that you stated that Ms. Lomas told you that Mr. Frank lifted his shirt showing off a gun to Mr. Skinner, saying what's up?

A.     She stated that he said something to the effect of what's up, and lifted his shirt.

Q.     And showed a gun to Mr. Skinner?

A.     That's what she said.

Q.     That's what she said, right?

A.     That's what she said.

Q.     That's what you put in your report, right?

A.     Yes.

Q.     Okay. So, at some point, Ms. Lomas tells you that they're passing; Mr. De'Omante Frank lifts his shirt up; shows a gun to Mr. Skinner.  Do they continue driving?

A.     Yes.

       . . . .

Q.     And at some point, Ms. Lomas tells you Mr. Skinner begins to fire from the vehicle?

A.     Yes.

Q.     Does she tell you whether or not she's focusing on the road at this time, or is she just looking---continuously looking at Mr. Frank to see what he's going to do with the gun or anything to that effect?

A.     I don't recall exactly what she said, except for the fact that he was firing from the window.

       . . . .

A.     She said that they continued eastbound, eventually coming to a stop sign, took a right, and then returned to her residence in Acadia Parish.

Q.    Okay. Did you ever get a clear idea as to the span of time between the initial verbal confrontation between Mr. Frank and Mr. Skinner at the store, and the actual shooting taking place?

A.    I don't know how long it took.

Q.    Do you know if it was days or hours?

A.    I would imagine it was the same day.

According to Lieutenant Young, Raymond's Grocery was two to three blocks from the location where the victim was shot.

After the shooting, the two returned to Lomas' home, and Defendant contacted his uncle, Keenan Skinner, to pick him up. Thereafter, Defendant cleaned the gun with a toothbrush.

Detective Victor Fontenot, who worked for the Eunice Police Department, was also dispatched to the scene on November 4, 2019. When he arrived, there was a crowd of twenty to thirty people. Detective Fontenot rendered aid to the victim by placing his finger in the wound, which was at the beltline. He had to pick up the victim's shirt to locate the wound and never saw a firearm. To Detective Fontenot's knowledge, no weapon was removed from the victim's person, and no one reported that a weapon was found on the victim. Detective Fontenot further testified that in a statement, Lomas said the victim "[p]icked up his shirt and I possibly saw a gun." He further testified:

> When we spoke to Lainey, she advised they were traveling---they stopped here; had a confrontation; shots were fired by Mr. Skinner. Once the shots began firing, she began driving off at a high rate of speed. She advised that she could hear the shell casings hitting the top of the vehicle so she sped even faster; tried to get away from the scene.

Detective Fontenot stated a confidential source, as well as Bazile, provided information to police:

> [T]he source told me Mr. Bazile just said that that car belongs to Lainey Lomas. Her boyfriend is "Grim"---is the way they said it---belongs to "Grim," which is Mr. Skinner, and there was a confrontation before the

shooting between Mr. Bazile, Mr. Frank, and Mr. Skinner, and that lady was driving the black vehicle, and "Grim"---again, her words---was in the passenger seat.

According to Detective Fontenot, Lomas was subsequently arrested, and a black Honda Accord registered to her mother was present at her home. Lomas admitted to driving the vehicle during the offense. In a second statement, Lomas stated she and Defendant returned to her residence, and Defendant cleaned the gun with a yellow toothbrush and possibly Clorox. Lomas further stated:

> [I]mmediately after the shooting Mr. Skinner asked her to use her cellphone, which he, at that time, called Devidre Doyle. Mr. Skinner advised Devidre that he had just shot at "Gotti," but wasn't sure if he hit him or not. He asked Mr. Doyle to get in a vehicle and go to the scene and see what he could find out.

Detective Fontenot spoke to Doyle who recalled the phone call from Defendant.

Detective Fontenot further detailed Lomas' statement to police:

> She told us that Mr. Skinner---he was actually sitting on the door well here with the window down, firing back this way---his upper body was out. He was firing back this way, and as he was---the ejection port on the firearms are on the right side, if any of you shoot pistols. So, what she was describing was, as he was shooting this way, the spent casings were bouncing off of the roof and that's why we located them on the north side of East Maple. The way she described it to us.

Tony Kennedy was formerly the Chief of Detectives at the Eunice Police Department. He was dispatched to the scene and saw the victim on the ground and a woman, Lori Bellard Bushnell, was performing CPR. Kennedy spoke to Alicia Michelle Ned, who was present at the scene, and obtained a statement from her and Bellard. To Kennedy's knowledge, a weapon was not removed from the victim's person, and no one reported that a weapon was found on the victim.

Bushnell, who is a home health nurse, was in the area after the shooting. She was on her way to a patient's house when she saw a body in the grass and a man doing CPR hollering for help. She stopped and assisted with CPR until medics arrived. Bushnell testified there was one person present when she arrived. She did

7

not see a gun on the victim, remove one from his body, or see another person remove a gun.

Sedra Andres testified that the victim lived behind her for five years. Andres was driving Ned's car and heard Ned's phone conversation with the victim as the two were on speakerphone. The conversation was interrupted by six or seven gunshots. Andres and Ned asked the victim if he heard the gunshots, and he did not answer. The victim then told them to come and get him because he had been shot. It took Andres less than two minutes to get to the location. When she and Ned arrived, the victim was lying face down on the ground. The two tried to get him to the car so they could take him to the hospital, but they could not do so. According to Andres, when they arrived, no one else was there. Andres testified she never saw a gun on the victim, she did not remove a gun, and did not see anyone else remove a gun. Bazile arrived and tried to give the victim CPR. A nurse then came on the scene and performed CPR. Andres stayed until the victim was taken away.

Alicia Michelle Ned testified she was speaking to the victim on the phone as she pulled into Beulah Gardens, which was a block from where he lived. Ned was speaking to the victim about him obtaining marijuana for them to smoke. While on the phone with the victim, she heard shots, and the victim said he had been hit. It took Ned approximately one minute to get to him. There were no others present when she and Andres arrived. Ned did not see a gun on or around the victim, and she did not remove a gun from him or see anyone else do so. Ned testified that Bazile showed up and started doing CPR on the victim. A nurse, Bellard, also did CPR when she stopped at the scene. All of the people Ned discussed were at the scene when Bellard arrived. Ned stayed with the victim until medical personnel took him from the scene.

Tim Cooper also testified and stated he saw the victim leaving home on November 4, 2019. He next saw him after he was shot. Cooper went to the scene and saw Ned, along with others, there. Cooper did not see a gun on the victim, did not remove a gun, nor did he see anyone remove a gun from the victim. He did not speak to anyone or do anything while there.

Lainey Lomas was granted immunity for her testimony at trial. As a result of the victim's death, Lomas had been arrested as a principal to second degree murder but had been charged with accessory after the fact to second degree murder.

Lomas lived in Acadia Parish in November 2019 and attended school at Eunice High School. On the day in question, she was driving a black Honda Accord that belonged to her mother, Rachel Lomas. She was in a relationship with Defendant in November 2019, and the two had dated for two years. Lomas knew the victim because he and Defendant were friends before they had a falling out.

According to Lomas, her mother checked her out of school on November 4 at 10:20 a.m. Lomas then drove her mother to work and picked up Defendant. Lomas knew Defendant had a gun in his waistband at that time because she saw the outline of it in his hoodie. She took Defendant to a friend's house to pick up his scale. Lomas then stated she took Defendant to his mother's home. On the way there, they saw Bazile and Frank by Raymond's Grocery. She was driving ten to fifteen miles per hour at that time, and there was a crack in the front passenger window. She did not see a gun on Bazile or Frank. Frank said, "what's up?---'pickin' his hands palm up." Defendant told Lomas to keep going.

Lomas then drove to the home of Defendant's mother. Lomas stayed in the car while Defendant went inside for approximately five minutes. When Defendant returned, he was angry because he had gotten into an argument with his mother. The two planned to ride around on country roads but ended up back on East Maple Street.

9

At that time, Defendant's window was down. According to Lomas, she and Defendant were not looking for the victim. However, they saw the victim alone in front of the projects. She did not hear the victim say anything. Defendant did not say anything either. As the car approached, the victim, who was on his bike and had his feet on the ground, lifted his shirt up, "'showin' a gun in his waistband," then put the shirt back down. Lomas testified she turned her head and hit the gas because she was afraid. She never saw the victim put his hands on the gun or remove it from his waistband. After she hit the gas, Defendant "came out the car and started 'shootin.'" He fired approximately ten times, using all the ammunition in the gun. Defendant "had his feet on the floorboard and he had a body angle 'comin' out the window to the side." Defendant was shooting behind him and from his waist up was outside the car. Lomas heard the casings coming off the roof of the car. Defendant said, "I think I hit him. I think I got him." Defendant subsequently called Doyle and told him to go to the scene.

Lomas drove to her home after the shooting. Once inside, Defendant asked for bleach, which Lomas retrieved from her aunt's home next door. Defendant cleaned his gun with the bleach and a yellow toothbrush and asked Lomas for some clothes. At Defendant's request, Lomas burned the clothes Defendant wore when he shot the victim. Defendant subsequently called his uncle for a ride. He then took the SIM card from his phone and threw the card in the ditch. Lomas testified that in the time she had known Defendant, he had never done anything violent.

Defendant testified that Lomas was his ex-girlfriend. However, the two were dating in November 2019. Lomas picked him up on the date at issue after she was checked out of school. The two went riding together. He first encountered the victim when he and Lomas were passing by the store. At this time, Defendant saw the victim and Bazile, who were two feet from the car. Defendant said the three men

10

made eye contact. Defendant was asked what happened next, and he replied, "Then De'Omante was, like, 'wha's' up, I mean, like you know, 'wha's' up bitch ass nigger?" Defendant said he told Lomas to keep driving as he was trying to ignore the comments.

Defendant and Lomas subsequently stopped at his mother's home to tell her happy birthday, then went to ride the back roads. Defendant denied going there to pick up a scale. The two subsequently encountered the victim, who was exiting the projects, about fifteen to twenty minutes after the first encounter. Defendant was in the passenger seat. He testified that as they were "'comin' on the side of him that's when he stopped on the bike, like, 'wha's' up now? And he picked up his gun." Defendant again confirmed that he saw the victim pick up his gun. According to Defendant, the victim removed the gun from his right waist. Defendant testified, "I 'jus' reacted. I felt like he was 'gonna' kill me or Ms. Lomas." Defendant testified that he shot in the victim's direction from three to four feet away but did not know how many shots he fired. Defendant indicated he fired because he was scared and thought he was about to die. Defendant testified again that the victim pulled out the gun and pointed it. He thought the victim was going to fire. He did not see him fall when he shot. Defendant testified that Lomas hit the gas when or because the victim pulled out the gun. While Lomas was driving to her house after shots were fired, Defendant said he told Lomas he hoped he did not hit the victim. He was at Lomas' house for twenty to thirty minutes, then his uncle picked him up. According to Defendant, he did not say anything to his uncle about what had occurred.

Defendant testified that after the shooting, while they were still in the car, he called Doyle and told him to make sure Defendant had not hit anyone. Defendant testified that he and Lomas went to her house. There, he did not ask for bleach and did not take off or change his clothes.

11

Defendant admitted to cleaning the gun with a yellow toothbrush. He said he did so because he was scared. He said he did not have his phone with him that day. He later threw the gun in the woods from a moving vehicle.

Defendant told police he was not involved in the shooting. He denied hanging out the car window to shoot.

Defendant said Raymond's Grocery was packed with people that day, but the victim was alone by the apartment complex. He realized approximately twenty minutes after the shooting that the victim had been shot and died. Defendant said he did not actually try to hit the victim. He thought the victim was threatening him because the bike came to a stop, and Frank pulled the gun out. Defendant said it was a "split-second decision."

Defendant was asked about Lomas:

Q. Okay. When you started shooting, did you have an occasion to look over and see what Ms. Lomas is doing?

A. Yeah, really "cuz" my head turned this way after, like, the first two shots.

Q. What did you see her doing?

A. She was "drivin;" she was "lookin" straight.

Q. She was driving?

A. She was "duckin" "lookin" straight.

Q. Okay, you heard the previous testimony of Ms. Lainey Lomas stating that she floored the vehicle?

A. Yes, sir.

Q. What do you take that to mean?

A. She hit the gas "cuz" she was scared. She "seen" him pull a gun out.

Defendant further testified that he was scared, and the victim pulled a gun on him.

12

Darius Bazile indicated that the victim was his best friend. Bazile was dropped off at the victim's apartment at approximately 9:00 or 10:00 on November 4. The two left the apartment and walked to Raymond's. On the walk back to the apartment, the victim flagged down a car. They left the apartment again to go to the barber shop and returned. Bazile woke from a nap and saw the victim getting ready to leave the apartment. The victim had a gun and money, which he was counting. He left, and Bazile heard gunshots three to five minutes later. Bazile eventually looked out the front door and saw familiar cars in the middle of the street. Bazile then ran to the street and went to the victim. Bazile tried to perform CPR. Ned, Andres, and Tyeesha Freeman were there. He was not aware of what occurred in the three to five minutes between the victim leaving the apartment and the time he heard gunshots.

Defendant contends the evidence was insufficient to prove beyond a reasonable doubt that he did not reasonably believe he was in imminent danger when he shot the victim. Defendant indicates the absence of a gun on the victim is not dispositive of the issues presented. He cites *State in Interest of D.S.*, 29,554 (La.App. 2 Cir. 5/7/97), 694 So.2d 565, in support of this contention. Defendant further suggests that Lomas and Bazile confirmed his testimony that the victim was armed, it was reasonable for him and Lomas to believe they were in imminent danger of losing their lives or receiving great bodily harm, and that he shot him to save them.

The State argues the jury could rationally conclude beyond a reasonable doubt that Defendant committed either second degree murder or manslaughter and that Defendant did not act in self-defense.

The issue presented in this assignment of error is whether Defendant reasonably believed that he was in imminent danger of death or great bodily harm. In *State v. Wilson*, 42,440, p. 8 (La.App. 2 Cir. 9/19/07), 965 So.2d 992, 997–98,

13

*writ denied*, 07-2084 (La. 3/7/08), 977 So.2d 898, the second circuit addressed a claim of self-defense wherein the defendant followed the victims when they left a nightclub and fired at least sixteen shots into the victims' vehicle while he passed in his truck:

> We also conclude that the jury did not err in disbelieving Wilson's claim of self-defense. The jury was presented with Wilson's version of the events - i.e., that he was in fear of his life due to the fact that the victims' vehicle was swerving into the path of his truck just prior to the shooting. He also testified that he only intended to shoot the victims' tires but missed because he had to keep his eyes on the road. However, that testimony was directly contradicted by Fields who testified that he saw Wilson looking at the victims as he fired the gun. The jury was within its province to believe Fields and reject Wilson. Moreover, the physical evidence also showed that two of the shots hit the front windshield, suggesting that Wilson not only shot at the vehicle as he drove by it, but he also shot after he had already passed the victims' vehicle. This required the very intentional act of Wilson aiming backwards out of the driver's side window-seemingly not a defensive tactic. As the trier of fact, the jury was free to accept or reject, in whole or in part, the testimony of any witness and where there was conflicting testimony about factual matters, the matter was one of the weight of the evidence, not its sufficiency. This jury was not in error in rejecting Wilson's claim of self-defense and concluding he had possessed the requisite specific intent to kill.

The jury in this case was presented with conflicting versions of the events surrounding the November 4, 2019 shooting. Defendant testified that the victim removed a gun from his waist and pointed it at him. Lomas testified that the victim only raised his shirt to reveal a gun then lowered his shirt. Bazile testified that the victim had a gun when he left the apartment. However, all persons who encountered the victim or rendered aid to him, some three to five minutes after he left Bazile, testified he did not have a gun and no gun was removed from his person. Due to conflicting testimony, the jury was faced with making credibility determinations, which cannot be second-guessed by this court. *State v. Lambert*, 97-64 (La.App. 3 Cir. 9/30/98), 720 So.2d 724.

Even if the jury chose to believe Defendant's testimony that the victim pointed a gun, Lomas' testimony that Defendant's body from the waist up was out of the car while he fired at the victim, which was confirmed by the testimony of Detective Fontenot, was sufficient to lead a rational trier of fact to the conclusion that Defendant did not reasonably believe he was in imminent danger of death or great bodily harm. As in *Wilson*, Defendant fired from a moving vehicle after he had passed the victim, signifying Defendant's act was not a defensive tactic.

"A defendant's flight and attempt to avoid apprehension are circumstances from which a trier of fact may infer a guilty conscience." *State v. Pham*, 12-635, p. 17 (La.App. 5 Cir. 5/16/13), 119 So.3d 202, 214, *writ denied*, 13-1398 (La. 12/6/13), 129 So.3d 531. In *State v. Alfred*, 22-477, pp. 18–19 (La.App. 3 Cir. 3/1/23), 358 So.3d 957, 965, this court stated:

> The jury was also presented with evidence revealing that Defendant fled the scene after the stabbing, which does not comport with that of a person who believed she acted in self-defense. Officer Soileau testified that Defendant was walking away from the apartment when she arrived on the scene, and the apartment complex's surveillance videos show Defendant leaving the scene with Brianna. Flight is a circumstance from which guilt can be inferred. *State v. Davies*, 350 So.2d 586 (La. 1977); *State v. Rubens*, 10-1114, p. 7 (La.App. 4 Cir. 11/30/11), 83 So.3d 30, *writ denied*, 12-374 (La. 5/25/12), 90 So.3d 410, *and writ denied*, 12-399 (La. 10/12/12), 99 So.3d 37, *cert. denied*, 568 U.S. 1236, 133 S.Ct. 1595, 185 L.Ed.2d 591 (2013).

Defendant left the scene in Lomas' vehicle. Lomas testified that Defendant cleaned the gun, she burned his clothing at his request, and he discarded his phone's SIM card. Additionally, Defendant testified that he threw the gun in the woods. Defendant's acts, if the jury believed they occurred, were indicative of a guilty conscience. Moreover, Defendant's statement to Lomas after the shooting, "I think I got him," and his subsequent call to Doyle instructing him to go to the scene conflict with an act of self-defense.

Based on the record and the evidence presented in this case, a rational jury could find that the State proved beyond a reasonable doubt that Defendant did not act in self-defense. Therefore, this assignment of error lacks merit.

*Assignment of Error No. 2*

In his second assignment of error, Defendant contends the trial court erred in not allowing prior hostile acts committed by the victim against Defendant to be admitted at trial.

> Although evidence of a person's character or a trait of his character is generally inadmissible for the purpose of proving that he acted in conformity therewith on a particular occasion, it may be introduced to support a plea of self-defense. See La. C.E. art. 404(A)(1)(a). In such circumstances, a defendant is entitled to introduce evidence of the decedent's prior threats or violent character for two distinct purposes: (1) to show defendant's reasonable apprehension of danger which would justify his conduct; and (2) to help determine who was the aggressor in the conflict." *State v. Lee*, 331 So.2d 455, 460 (La. 1975).

*State v. Burton*, 19-1079, p. 4 (La. 6/30/21), 320 So.3d 1117, 1121 (per curiam).

Louisiana Code of Evidence Article 404 provides, in pertinent part:

> A. **Character evidence generally.** Evidence of a person's character or a trait of his character, such as a moral quality, is not admissible in a civil or criminal proceeding for the purpose of proving that he acted in conformity therewith on a particular occasion, except:
> . . . .
> 2) **Character of victim.** (a) Except as provided in Article 412, evidence of a pertinent trait of character, such as a moral quality, of the victim of the crime offered by an accused, or by the prosecution to rebut the character evidence; provided that in the absence of evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, evidence of his dangerous character is not admissible . . . .
> . . . .
> B. **Other crimes, wrongs, or acts**
> . . . .
> 2) In the absence of evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, evidence of the victim's prior threats against the accused or the accused's state of mind as to the victim's dangerous character is not admissible . . . .

16

The statute and jurisprudence require that an overt act be established before the dangerous-character and threat evidence concerning the decedent may be introduced. *State v. Lee*, 331 So.2d 455 (La.1975).

> An overt act is a hostile demonstration of such character as to create in the mind of a reasonable person the belief that he is in immediate danger of losing his life or of suffering great bodily harm. The term "overt act," as used in connection with prosecutions for murder where the plea of self defense is involved, means any act of the deceased which manifests to the mind of a reasonable person a present intention on his part to kill defendant or do him great bodily harm.

*State v. Brown*, 172 La. 121, 129, 133 So. 383, 386 (1931). Jurisprudence requires appreciable evidence of the overt act. *Lee*, 331 So.2d 455. When appreciable evidence of the overt act is in the record, the trial court cannot infringe on the fact-finding function of the jury by disbelieving the defense testimony and thereby deny the accused a defense permitted by law. *Id.*

While testifying, Lomas stated that Defendant and the victim were friends until they had a falling out. When asked if Defendant feared "Gotti" (the victim's nickname) and if "Gotti" ever tried to shoot Defendant, Lomas responded in the affirmative. The State then objected to this testimony, maintaining it was prohibited under La.Code Evid. art. 404 (A)(2) and (B)(2). The State noted that questioning Lomas as to Defendant's state of mind and prior threats by Frank against Defendant was improper in the absence of evidence of a hostile demonstration or overt act at the time of the offense. The State and defense counsel argued over whether the victim lifting his shirt to show a gun was evidence of an overt act. The trial court then issued this ruling from the bench:

> This case states, an overt act by the victim must cause a reasonable person to fear that he is in imminent danger of great bodily harm to justify a homicide. *State v. Jackson*, 419 So.2d 425 (La. 1982).
>
> In *State v. Cavalier*, 421 So.2d 892, 894 (La. 1982), this court found more [sic] appreciable overt hostile act when the victim walked

17

across the street toward the defendant and reached into his waistband. [however the supreme court found no overt act in its ruling in *Cavalier*.]

In *State v. Edwards*, 420 So.2d 663, 670 (La. 1982), the court found that overt act or hostile demonstration when the victim sprang from the bed, cursed the defendant, and told her, "I told you I'd kill you if you come here again." The victim was two feet from the defendant when he was shot and the defendant had backed away before shooting. In *State v. Jackson* on re-hearing, this court found that the defendant reasonably believed herself to be in imminent danger of assault when the victim approached her in a threatening manner, cursing, and holding her right arm behind her and continuing to advance after warning shots had been fired. . .

All that to say this, the way I determine it is this; in my mind in today's world, having a gun in a waistband and flashing it, I think, has certain meanings. But I think under the line of jurisprudence that I just quoted---and I wasn't able to find anything more recent---I think that just showing the gun, dropping the shirt---not removing the gun, not aiming the gun, not firing any kind of warning shot, not taking any step closer to the victim---I think all of that cuts in favor of this not constituting a hostile demonstration or an overt act. And that seems, again, a little---it doesn't sit well with me in today's world, but I have to judge the facts of this case under the current jurisprudence, and apply the current jurisprudence.

But the thing that also makes me feel better about this decision is, even though Mr. Frank has the nickname "Gotti" he's riding a bicycle. He's on a bicycle in Eunice. Mr. Skinner is in a car, and Mr. Skinner's girlfriend testifies that when she sees this act, she hits the gas. So, at that point the imminent---there was no imminent threat because he was in a means of conveyance that allowed him to get away from the threat.

. . . .

The objection at issue was about a prior threat. Right now, based on what I have, and the objection in front of me right now, and the case law I just cited, I don't think it [sic] I can hold that the action of just showing the gun in the waistband and dropping the shirt constituted a hostile demonstration or an overt act. And it's further supported by the fact that he's in a vehicle; a means of conveyance that gives him the ability to distance himself from Mr. Frank, and that cuts against the cases that say there must be an imminent danger of great bodily harm. Mr. Frank wasn't going to peddle furiously and catch the car. And he didn't have the weapon pulled. And it also cuts against any appreciable---there's no appreciable evidence of it. That's my ruling.

The trial court then admonished the jury to disregard the last two statements by

Lomas.

We find the trial court did not err in finding Lomas' testimony that the victim raised his shirt to show the gun and then dropped the shirt was not appreciable evidence of an overt act. Along with the cases cited above by the trial court, we note the following: In *State v. Jones*, 451 So.2d 1181, 1186 (La.App. 1 Cir.1984), the court found the victim's act of "going in his pocket" for what defendant believed to be a knife during an argument with defendant was insufficient appreciable evidence of an overt act that would lead reasonable person to fear for his life. In *State v. Schexnayder*, 97-729 (La.App. 1 Cir. 4/8/98), 708 So.2d 851, *writ denied*, 98-1665 (La. 10/30/98), 723 So.2d 978, the court found the victim's actions of moving towards the defendant while cursing and reaching in his pocket did not constitute appreciable evidence of an overt act. In *State v. Ducre*, 596 So.2d 1372 (La.App. 1 Cir.), *writ denied*, 600 So.2d 637 (La.1992), the defendant argued an overt act was established by the fact that the victim was armed with a gun and was the verbal aggressor in the argument. The court found no appreciable evidence of an overt act when the victim approached defendant while simply making hand gestures, even assuming the victim had a gun in his pocket. *Id.*

On the third day of trial, the parties discussed whether statements and/or testimony by Bazile were admissible and whether Bazile had personal knowledge of an overt act committed by Frank at the time of the offense. Thereafter, defense counsel stated, "So, we're saying that if on the day in question, Mr. Darius Bazile actually, actually saw Mr. De'Omante Frank with a firearm, that it's inadmissible unless an overt act is shown?" The trial court addressed the issue, stating:

> And my ruling yesterday was, even if I believe Lainey Lomas
> that he lifted the shirt, showed he had a gun in his waistband, and then
> dropped his shirt, the cases that were cited say that's not enough, and
> that was the only evidence you had at that time. And then I further found
> that it didn't constitute appreciable evidence, because even though you
> had Lainey---and the jury may very well find her to be credible---you
> also have the controverted evidence no one found a gun.

19

> . . . .
>
> . . . So, I said, number one, the jurisprudence; under the examples given in the jurisprudence, this doesn't amount to a hostile demonstration or an overt act, even though personally I probably would disagree, I have to follow the established line of jurisprudence.
>
> . . . .
>
> Secondly, the cases require appreciable evidence. This evidence is controverted. I don't find it rises to the level of appreciable evidence, and there's no sense of imminency because he's in a car, the other one's on a bike, and a third person saying I'm driving the shooter away from the victim/potential aggressor as fast---I've gunned it--- I speed away.

The court further noted that "a gun three months before the shooting 'ain't' 'gonna' happen." However, a gun thirty minutes before the shooting gave the court "some pause."

Shortly thereafter, defense counsel asked if testimony by Bazile about seeing Frank with a gun moments before the shooting was character evidence. The trial court discussed the applicable statutes and concluded:

> I made a ruling yesterday that there was an absence of appreciable evidence---appreciable is in the case law, not in the code---but the absence of appreciable evidence of a hostile demonstration or an overt act. That's the problem, so then you can't go back to anything prior to the time of the act.

The trial court subsequently stated it would defer ruling as to Bazile's testimony, which the jury ultimately heard.

During Defendant's testimony, defense counsel argued that Defendant's testimony that the victim removed a gun from his waist and pointed it was sufficient to constitute an overt act. Because Defendant raised a claim of self-defense and proved an overt act, he could present evidence of the victim's character. The State maintained there had not been appreciable evidence of an overt act because there was no corroborating evidence of Defendant's testimony that the victim removed the gun from his waistband and pointed it at him. The State's argument was based on testimony by Lomas that the victim never removed the gun from his waistband, let alone pointed it at Defendant. The trial court then found:

20

Now that he's taken the stand; now that he's testified that he says he saw a gun, the State has fertile ground for cross-examination, and I think it's at least a hostile demonstration or an overt act. Am I going to open the door to the entire history between these two? No. The only thing I'm going to open the door to is the events of that day, because there's already been evidence about---including from him--- about something happening at the store. Again, there's contradictory statements. The State can plow through that on cross-examination, and I don't think that they're extremely prejudice \[sic\] by that because there seems to be a lot of different versions of that story. But I'm not going to allow anything beyond the events of that day. And the only reason I'm doing that is, now that he's established that he thinks he saw a gun---as she said, he's the only one so far that says it was pulled out of the pants, and there's no gun in evidence---but because the two events are allegedly close in time, I'm going to find them to be sort of the same transaction or occurrence. I'm going to allow you to question about that day and that day only. No prior threats, no prior gunshot, nothing. Because none of that can be corroborated or verified, and the dead witness can't come and be cross-examined about that. And the cops probably didn't investigate that and I'm not opening this thing up to the whole history between these two. That's my ruling.

Thus, although finding earlier that the victim's act of simply raising his shirt to indicate he had a gun on his person, was not sufficient to constitute appreciable evidence of an overt act, the trial court apparently did find Defendant's testimony that the victim removed the gun from his waistband and pointed it at the victim did constitute appreciable evidence of an overt act. We disagree and find this decision by the trial court was erroneous and in conflict with the jurisprudence.

In *State v. James*, 339 So.2d 741, 746 (La.1976), the supreme court held the "self-serving, contradicted testimony of the defendant . . . is not appreciable evidence tending to establish an overt act." Similarly, in *State v. Kennell*, 54,577, p. 25 (La.App. 2 Cir. 6/29/22), 342 So.3d 437, 450, the appellate court held "that a defendant's unsupported, self-serving testimony which is sufficiently contradicted by other evidence does not constitute 'appreciable evidence' of an overt act or hostile demonstration on the part of the victim. See *State v. Hardeman*, 467 So.2d 1163 (La. App. 2 Cir. 1985)."

21

In *State v. Thomas*, 11-1219 (La.App. 4 Cir. 12/6/12), 106 So.3d 665, *writ denied*, 13-13 (La. 12/6/13), 129 So.3d 527, the defendant claimed self defense, alleging that while he was conversing with the victim, the victim asked to see defendant's gun, and when defendant lifted his shirt to display his holstered gun, defendant claimed the victim leaned forward and reached out for his gun. The defendant also claimed he did not start shooting until he was backed into a wall by the victim and the victim had him by the wrist. However, the victim's girlfriend denied ever seeing the victim reach for defendant's person and try to take anything off his person. The appellate court held:

> defendant's self-serving testimony that [the victim] reached out as if to take his gun, backed him against a wall, and when he began shooting at [the victim], [the victim] had him by the wrist, is contradicted by the testimony of [the victim's girlfriend], who was approximately six feet from the two men when defendant started shooting. She did not see [the victim] reach out toward defendant, but witnessed defendant pull the gun from behind his back and immediately start shooting. Thus, defendant's self-serving testimony was sufficiently contradicted by other evidence. Consequently, that self-serving testimony did not constitute "appreciable evidence" of a hostile demonstration or an overt act by the victim.

*Id.* at 676-77.

In the present case, Defendant's testimony was contradicted by that of his girlfriend, Lainey Lomas, who stated she saw the victim sitting stationary on his bike as they drove by. Lomas testified the victim lifted his shirt to show he had a gun, then dropped his shirt back down. According to Lomas, the victim did not touch his firearm, let alone remove it and point it at Defendant. Further, the State noted Defendant's version of the facts that the victim pointed the gun at him was stated for the first time at trial and was never told to investigators. Therefore, the trial court erred in not finding Defendant's self-serving testimony was contradicted by other evidence and cannot under the jurisprudence constitute "appreciable evidence" of an overt act by the victim.

22

Therefore, finding that Defendant failed to establish that the victim committed an overt act, this assignment of error lacks merit.

***Assignment of Error No. 3***

In his third assignment of error, Defendant contends trial counsel was ineffective in failing to file several motions and raise certain objections. Defendant suggests defense counsel was ineffective for failing to request a presentence investigation report (PSI), file a Motion to Reconsider Sentence, or lodge several other objections. Defendant alleges there is no reasonable explanation for failing to file a motion to reconsider and notes the failure limits Defendant to a bare bones review of his sentence for constitutional excessiveness. Defendant then suggests that at least a PSI should have been requested. He further argues: "There were also several times when suspect evidence was allowed in with no objection, such as when Lainey testified she and [Defendant] drove to his grandmother's home to get a scale, or when testimony regarding a stolen gun recovered from the vehicle [Defendant] was detained in was admitted."

The State submits this appeal is not the proper avenue for Defendant's claims. The State notes Defendant makes no showing or specific claims that a motion to reconsider or a PSI would have resulted in a different sentence. Moreover, the evidence supported a conviction of second degree murder. Thus, the trial court would not have erred in sentencing Defendant to forty years. The State further asserts Defendant's sentence is not excessive.

Motion to Reconsider Sentence

Defense counsel failed to object at the time Defendant's sentence was imposed and did not file a Motion to Reconsider Sentence.

In *State v. Doucet*, 09-1065, pp. 6–7 (La.App. 3 Cir. 5/5/10), 36 So.3d 1105, 1110–11 (third alteration in original), *writ denied*, 10-1195 (La. 12/17/10), 51 So.3d

19, this court discussed ineffective assistance of counsel for failure to file a motion to reconsider as follows:

> [W]hen the record contains sufficient evidence to address the ineffective assistance of counsel issue, this court examines "whether there was a reasonable probability that the trial court would have reduced" Defendant's sentence if Defendant's trial counsel made or filed a motion to reconsider sentence. [*State v. Blake*, 03-1465 (La.App. 3 Cir. 5/5/04), 872 So.2d 602] at 608 (citing *State v. Prudhomme*, 02–511 (La.App. 3 Cir. 10/30/02), 829 So.2d 1166, *writ denied*, 02–3230 (La.10/10/03), 855 So.2d 324).

> When the defense counsel fails to file a motion to reconsider sentence, Defendant may have a claim of ineffective assistance of counsel when Defendant "can show a reasonable probability, but for defense counsel's error, his sentence would have been different." *Prudhomme*, 829 So.2d at 1177 (citing *State v. Texada*, 98–1647 (La.App. 3 Cir. 5/5/99), 734 So.2d 854). Moreover,

> > [a] claim of ineffective assistance of counsel is properly raised in an application for post-conviction relief. This allows the trial judge an opportunity to order a full evidentiary hearing on the matter. *State v. Burkhalter*, 428 So.2d 449 (La.1983). However, where the record contains evidence sufficient to decide the issue and the issue is raised by an assignment of error on appeal, it may be considered. *State v. James*, 95-962 (La.App. 3 Cir. 2/14/96); 670 So.2d 461.

> *State v. Francis*, 99-208, pp. 10-11 (La.App. 3 Cir. 10/6/99), 748 So.2d 484, 491, *writ denied*, 00-544 (La.11/13/00), 773 So.2d 156.

> To prove an allegation of ineffectiveness, Defendant must specifically show prejudice. *Blake*, 872 So.2d 602 (citing *State v. Reed*, 00-1537 (La.App. 3 Cir. 3/6/02), 809 So.2d 1261, *writ denied*, 02-1313 (La.4/25/03), 842 So.2d 391). "Whether or not a defendant received ineffective assistance of counsel is a two-part inquiry. First, we must determine whether the trial court would have reduced the Defendant's sentences upon the filing of a 'Motion to Reconsider Sentence.' Second, we must determine whether the sentences were excessive." *Id.* at 609.

In his brief, Defendant does not mention the sentence imposed by the trial court, address whether the trial court would have reduced his sentence upon the filing of a Motion to Reconsider Sentence, set out the law regarding excessive sentence claims, nor discuss the excessiveness of his sentence.

Therefore, Defendant has not properly briefed the issue as required by Uniform Rules—Courts of Appeal, Rule 2–12.4 and has not met his burden of proof under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984).

PSI

The trial court did not order a PSI in this case. However, Defendant's brief did not set forth the law governing PSIs, what a PSI would have revealed, or why defense counsel was ineffective for failing to request one. For these reasons, Defendant has not properly briefed the issue as required by Uniform Rules—Courts of Appeal, Rule 2–12.4 and has not met his burden of proof under *Strickland*.

Objections

Defendant has set forth two instances where he feels defense counsel should have objected: 1) when Lomas testified regarding a scale; and 2) when the State elicited testimony regarding recovery of a stolen gun. Defendant failed to set forth the bases for the objections he avers defense counsel should have made, the law regarding the admissibility of the testimony at issue, and to analyze counsel's actions under *Strickland*. Thus, Defendant has not properly briefed the issue as required by Uniform Rules—Courts of Appeal, Rule 2–12.4 and has not met his burden of proof under *Strickland*.

## DECREE

For the foregoing reasons, Defendant's conviction and sentence are affirmed.

**AFFIRMED.**

25